# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **ROBIN BEATY, et al.,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**REPUBLIC OF IRAQ,**<br><br>**Defendant.** | **Civil Action No. 03-0215 (JDB)** |

## MEMORANDUM OPINION

United States citizens Kevin Beaty and William Barloon were detained and allegedly held as hostages by the former Iraqi regime in the 1990s. Along with other former detainees and their spouses, Beaty and Barloon filed suit against Iraq in 1996, eventually obtaining a default judgment against it. See Daliberti v. Republic of Iraq, 146 F. Supp. 2d 19 (D.D.C. 2001) ("Daliberti II"); Daliberti v. Republic of Iraq, 97 F. Supp. 2d 38 (D.D.C. 2000) ("Daliberti I"). The plaintiffs in this case - - Jordan Beaty, Austin Makenzie Beaty, William R. Barloon, Bryan C. Barloon, and Rebecca L. Barloon - - are the children of Kevin Beaty and William Barloon. Invoking the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(7), plaintiffs seek damages against Iraq for the emotional distress that they allegedly suffered during their fathers' captivity.

Iraq has filed a motion to dismiss in which it asserts that plaintiffs have failed to state a claim upon which relief can be granted, that this Court lacks subject-matter jurisdiction, and that plaintiffs' claims are either nonjusticiable or preempted because of their potential to undermine

United States foreign policy.  The United States has submitted a statement of interest reaffirming its position that actions taken by the political branches after the filing of the original complaint divest this Court of jurisdiction.  For their part, plaintiffs maintain that recent decisions of the D.C. Circuit and this Court establish that there is a jurisdictional basis for their suit, that their claims are justiciable, and that they are entitled to partial summary judgment based on the facts established in the <u>Daliberti</u> case.  Pending before the Court are defendant's motion to dismiss and plaintiffs' motion for partial summary judgment.  For the reasons set forth below, the Court will grant in part and deny in part both motions.

## <u>BACKGROUND</u>

The facts underlying the detention and captivity of Beaty and Barloon are recounted at length in the two reported decisions in the <u>Daliberti</u> litigation, <u>see</u> 146 F. Supp. 2d at 21-23; 97 F. Supp. 2d at 41-42, and have not been disputed here.  (These facts are drawn from plaintiffs' Third Amended Complaint, as well as the <u>Daliberti</u> opinions, of which this Court may take judicial notice.  <u>See</u> <u>Estate of Heiser v. Islamic Republic of Iran</u>, 466 F. Supp. 2d 229, 263 (D.D.C. 2006); <u>Salazar v. Islamic Republic of Iran</u>, 370 F. Supp. 2d 105, 109 n.6 (D.D.C. 2005).)  Beaty and Barloon resided in Kuwait and worked in civilian capacities following the conclusion of the Persian Gulf War in 1991.  Beaty worked as a drilling supervisor on an oil rig, and Barloon supervised aircraft maintenance and overhaul.  Third Am. Compl. ¶ 7.  In April of 1993, Beaty was detained by Iraqi border guards and taken at gunpoint first to Basra and later to Baghdad.  <u>Id.</u> at ¶¶ 9-11.  For a period of 205 days, Beaty lived in squalid conditions in two Iraqi prisons, where he was deprived of food and water, as well as medication for his heart condition.  <u>Id.</u> at ¶¶ 10-11.

Iraq conditioned Beaty's release on either the lifting of the economic sanctions that had been imposed upon it or a significant monetary ransom.  Id. at ¶ 12.  Only after efforts by Beaty's wife Robin and prominent political figures, including former President Jimmy Carter and then-Oklahoma Senator David Boren, did Iraq release Beaty.  Id. at ¶¶ 12-13.

Barloon was detained by an Iraqi border guard in March of 1995.  Id. at ¶ 14.  Like Beaty, he was transported first to Basra and then to Baghdad, where, again like Beaty, he was eventually held at the now infamous Abu Ghraib prison.  Id. at ¶ 16.  During his 126 days of detention, Barloon was deprived of food, water, and other necessities.  Id. at ¶ 17.  His captors beat him and, on one occasion, subjected him to a mock execution.  Id.; see Daliberti II, 146 F. Supp. 2d at 23. Diplomatic efforts by the Clinton Administration, and in particular the intervention of then-Congressman Bill Richardson, led to Barloon's release in late 1995.  Third Am. Compl. ¶¶ 18-20.

Beaty and Barloon, joined by their wives, two other detainees, and those detainees' spouses, filed suit against Iraq in May of 1996.  The four men sought damages for kidnapping, false imprisonment, and torture; their wives sought recovery for intentional infliction of emotional distress and loss of consortium.  See Daliberti I, 97 F. Supp. 2d at 41-42.  The jurisdictional basis for the suit was provided by legislation that Congress had enacted just weeks earlier: section 221(a) of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  See Pub. L. 104-132, § 221(a), 110 Stat. 1214, 1242-43 (April 24, 1996).  A key provision in that legislation deprived countries designated as state sponsors of terrorism of sovereign immunity from suits seeking money damages "for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act if such act or provision of material support is engaged in by an

official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." Id. (codified at 28 U.S.C. § 1605(a)(7)).

After the Clerk of the Court entered default against it, Iraq appeared by counsel and filed a motion to dismiss the civil suit. Daliberti I, 97 F. Supp. 2d at 42. Judge Friedman concluded that the plaintiffs had "met their burden of showing that the actions they complain of fall under the state sponsored terrorism exception to foreign sovereign immunity in 28 U.S.C. 1607(a)(7)," specifically by demonstrating that they had been the victims of "torture" and "hostage taking" - - two of the acts enumerated in the statute. Id. at 45-46. He also rejected Iraq's contentions that the state-sponsored terrorism exception is unconstitutional and that adjudication of the suit was barred by the act-of-state doctrine. Id. at 48-55. Accordingly, he denied Iraq's motion to dismiss. After its motion was denied, Iraq's counsel withdrew from the case, and the Clerk of the Court once again entered default against Iraq. The case was then transferred to Judge Oberdorfer, who conducted a four-day bench trial, issued findings of fact, and entered final judgment in favor of the plaintiffs. Daliberti II, 146 F. Supp. 2d at 21. That judgment awarded millions of dollars in damages to the male plaintiffs for the physical hardships suffered during their captivity and their psychological problems since release, as well as millions of dollars to the men's wives for "loss of the society and companionship of their husbands." Id. at 24, 26-27.

Not covered by the Daliberti judgment, however, were the Beaty and Barloon children. Those five children, plaintiffs here, filed a complaint in February of 2003 seeking monetary damages for the "mental anguish, pain and suffering during the period of their fathers' incarceration." Compl. ¶ 10. (The filing of their complaint almost two years after the Daliberti judgment was not just happenstance: a ten-year statute of limitations governs cases brought under

§ 1605(a)(7), <u>see</u> 28 U.S.C. § 1605(f), and Beaty's detention and captivity began and ended in

1993.)  But shortly after plaintiffs filed their complaint, events outside and inside the courthouse

dramatically altered the existing legal and political landscape.  A United States-led coalition

commenced a military invasion of Iraq on March 20, 2003, eventually toppling the regime headed

by Saddam Hussein.  In support of the war effort, Congress passed the Emergency Wartime

Supplemental Appropriations Act ("EWSAA"), Pub. L. No. 108-11, 117 Stat. 559 (2003).  The

EWSAA provided funding for military operations in Iraq and homeland security measures in the

United States.  It also gave the President the authority to suspend certain laws that had barred aid

to Iraq and to "make inapplicable with respect to Iraq . . . any other provision of law that applies to

countries that have supported terrorism."  Pub. L. No. 108-11, § 1503, 117 Stat. at 579.  President

George W. Bush exercised the authority granted by Congress when he issued Presidential

Determination 2003-23 on May 7, 2003.  Echoing the language of the EWSAA, the Presidential

Determination purported to "make inapplicable with respect to Iraq section 620A of the Foreign

Assistance Act of 1961 . . . and any other provision of law that applies to countries that have

supported terrorism."  68 Fed. Reg. 26,459 (May 7, 003).  The President explained in a message to

Congress the following week his understanding that the laws made "inapplicable" to Iraq in

Presidential Determination 2003-23 included 28 U.S.C. § 1605(a)(7), the state-sponsored

terrorism exception to the FSIA.  <u>See</u> 39 Weekly Comp. Pres. Doc. 647, 647-48 (May 22, 2003).

At virtually the same time that the political branches worked to adapt the laws to a

changing political and military situation, the U.S. Court of Appeals for the D.C. Circuit was

issuing a series of important rulings addressing unanswered questions as to the contours of 28

U.S.C. § 1605(a)(7).  One of those decisions, <u>Ciccipio-Puleo v. Islamic Republic of Iran</u>, 353 F.3d

1024 (D.C. Cir. 2004), was issued shortly after the first status conference in this case.  The court

of appeals in Ciccipio resolved two questions of far-reaching significance in the FSIA context.  It

first held that § 1605(a)(7) confers subject-matter jurisdiction but "does not create a private right

of action."  Id. at 1034.  A second key question related to the so-called Flatow Amendment, 28

U.S.C. § 1605 note, a provision passed in 1996 that allowed U.S. nationals injured or killed by

acts of terrorism to seek money damages - - including punitive damages - - from officials or

agents of foreign states designated as sponsors of terrorism.  That provision, the court of appeals

held, "creates a private right of action against officials, employees, and agents of foreign states,"

but this "cause of action is limited to claims against those officials in their individual, as opposed

to their official, capacities."  Id.  In other words, the Flatow Amendment does not provide a cause

of action against the foreign state itself.  Because the plaintiffs in Ciccipio may have labored

under the misconception that the Flatow Amendment provided just such a cause of action, the

court of appeals remanded the case to give them "an opportunity to amend their complaint to state

a cause of action under some other source of law, including state law."  Id. at 1036.

        In light of Presidential Determination No. 2003-23 and the D.C. Circuit's decision in

Ciccipio-Puleo, this Court invited the United States to file a statement of interest expressing the

government's position on subject-matter jurisdiction.  Dkt. #4 (Order of 1/29/2004).  The United

States accepted the Court's invitation and submitted a brief in which it argued that the Presidential

Determination, made pursuant to authority granted by Congress in the EWSAA, had restored

Iraq's sovereign immunity effective immediately and that this Determination did not contain an

exception (express or implied) for terrorism-related suits that had been filed prior to the passage

of the EWSAA.  See First Statement of Interest of the United States at 8, 12.  To the extent that

the Presidential Determination did not divest the Court of subject-matter jurisdiction, the United

States maintained that plaintiffs' complaint suffered from the same defect as that of the plaintiffs

in Ciccipio-Puleo and thus failed to state a claim, "at least as currently pled." Id. at 28.

Before this Court had the chance to evaluate the United States' main argument, the D.C.

Circuit did so in Acree v. Republic of Iraq, 370 F.3d 41 (D.C. Cir. 2004), cert. denied, 544 U.S.

1010 (2005).  The principal question in Acree was whether the language in § 1503 of the EWSAA

authorized the President to make the state-sponsored terrorism exception to the FSIA inapplicable

to Iraq.  Answering that "exceedingly close question" in the negative, the Acree majority

concluded that the phrase "any other provision of law that applies to countries that have supported

terrorism," when read in context, "authorizes the President to make inapplicable to Iraq those

provisions of law that impose economic sanctions on Iraq or that present legal obstacles to the

provision of assistance to the Iraqi Government," but was "not intended to alter the jurisdiction of

the federal courts under the FSIA".  Id. at 51, 55.  Section 1605(a)(7) of the FSIA, the court held,

was not a provision included within the Congressional grant of authority, and the President's

exercise of power beyond that grant was thus without effect.  Id. at 57.  The court went on to

conclude that the plaintiffs had nevertheless failed to state a claim upon which relief could be

granted because, as in Ciccipio-Puleo, they had not "identif[ied] a particular cause of action

arising out of a specific source of law."  Id. at 59-60.  Although agreeing with the majority that the

plaintiffs' suit must be dismissed and that the statutory-construction issue presented a close

question, then-Circuit Judge (now Chief Justice) Roberts would have accepted the United States'

argument that § 1503 of the EWSAA granted the President authority to make 28 U.S.C.

§ 1605(a)(7) inapplicable to Iraq and that Presidential Determination 2003-23 "ousted the federal

courts of jurisdiction in cases that relied on that exception to Iraq's sovereign immunity."  Id. at 60, 62 (Roberts, J., concurring in part and concurring in the judgment).  The United States, having secured on behalf of Iraq (which did not appear) dismissal of the plaintiffs' suit, did not seek further review of the statutory-interpretation issue before either the en banc D.C. Circuit or the U.S. Supreme Court.

Acree, along with the earlier decision in Ciccipio-Puleo, forced the parties to the present litigation to reassess their positions.  Iraq entered an appearance through counsel.  The United States submitted a second and, upon the Court's invitation, a third Statement of Interest.  Plaintiffs filed a series of amended complaints designed to comply with Ciccipio-Puleo, culminating in a Third Amended Complaint.  In the three-count complaint, plaintiffs allege that they were aware of their fathers' captivity in Iraq, that they were able to see through media sources where their fathers were being held, and that they learned that their fathers were suffering mentally and emotionally. See Third Am. Comp. ¶ 22.  Plaintiffs claim to have "endured severe mental anguish, depression, humiliation, anxiety, and pain and suffering as a direct result of their fathers' captivity."  Id. at ¶ 21.  They ground their prayer for money damages in three causes of action: intentional infliction of emotional distress under state common law (Count I), violations of customary international law incorporated into federal common law (Count II), and loss of solatium under federal common law (Count III).  Plaintiffs contend that there are no disputed facts and that they are entitled to partial summary judgment.  Iraq, backed in part by the United States, argues that plaintiffs' suit should be dismissed on jurisdictional and prudential grounds, or alternatively because plaintiffs have failed to state a valid claim.  The parties ably advocated their positions at a motions hearing held on March 2, 2007, and their respective motions are now ripe for resolution.

## STANDARDS OF REVIEW

Iraq seeks dismissal of plaintiffs' complaint on the grounds that it fails to state a claim upon which relief can be granted, that it presents a nonjusticiable political question, and that this Court lacks jurisdiction.  The first of these three grounds constitutes a motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure, whereas the latter two challenge subject-matter jurisdiction and must be evaluated under Rule 12(b)(1).  See, e.g., Gonzalez-Vera v. Kissinger, 449 F.3d 1260, 1262 (D.C. Cir. 2006) (political-question doctrine goes to subject-matter jurisdiction).  "[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); see Leatherman v. Tarrant Cty. Narcotics and Coordination Unit, 507 U.S. 163, 164 (1993); Phillips v. Bureau of Prisons, 591 F.2d 966, 968 (D.C. Cir. 1979).  Therefore, the factual allegations must be presumed true, and plaintiffs must be given every favorable inference that may be drawn from the allegations of fact.  Scheuer, 416 U.S. at  236; Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000).  At the same time, courts need not accept as true "a legal conclusion couched as a factual allegation," nor inferences that are unsupported by the facts set out in the complaint.  Trudeau v. Federal Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

Under Rule 12(b)(1), those seeking to invoke the jurisdiction of a federal court - - plaintiffs here - - bear the burden of establishing that the court has jurisdiction.  See US Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000); see also Grand Lodge of Fraternal

Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001) (a court has an "affirmative

obligation to ensure that it is acting within the scope of its jurisdictional authority").  "'[F]actual

allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in

resolving a 12(b)(6) motion for failure to state a claim."  Grand Lodge, 185 F. Supp. 2d at 13-14

(quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d

ed. 1987)).  A court may consider material other than the allegations of the complaint in

determining whether it has jurisdiction, so long as it still accepts the factual allegations in the

complaint as true.  See Jerome Stevens Pharmaceuticals, Inc. v. Food and Drug Admin., 402 F.3d

1249, 1253-54 (D.C. Cir. 2005).  Additionally, "[w]here the motion to dismiss is based on a claim

of foreign sovereign immunity, which provides protection from suit and not merely a defense to

liability . . . the court must engage in sufficient pretrial factual and legal determinations to satisfy

itself of its authority to hear the case before trial."  Jungquist v. Sheikh Sultan Bin Khalifa Al

Nahyan, 115 F.3d 1020, 1027-28 (D.C. Cir. 1997) (citation and quotation marks omitted).

    A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure will

not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in

support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46

(1957); see also Haynesworth v. Miller, 820 F.2d 1245, 1254 (D.C. Cir. 1987).  All that the

Federal Rules of Civil Procedure require of a complaint is that it contain "'a short and plain

statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and

the grounds upon which it rests." Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 346

(2005) (quoting Conley, 355 U.S. at 47).  "Given the Federal Rules' simplified standard for

pleading, '[a] court may dismiss a complaint only if it is clear that no relief could be granted under

any set of facts that could be proved consistent with the allegations.'" Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514 (2002) (quoting Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)).

Also pending is plaintiffs' motion for partial summary judgment.  Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its motion by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Fed. R. Civ. P. 56(c)).

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, a court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position.  Id. at 252.  By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment.  Celotex, 477 U.S. at 322.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations omitted).  Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

**DISCUSSION**

In moving to dismiss plaintiffs' complaint, Iraq has a number of arrows in its quiver.  It

first argues, largely with reference to legal and political developments since the United States-led

invasion in 2003, that adjudication of plaintiffs' claims "would compromise critical U.S. foreign

policy objectives," and that the case must therefore be dismissed.  See Def.'s Opp'n and Reply at

5.  Should the Court decline to dismiss the case on jurisdictional or related prudential grounds,

Iraq maintains that plaintiffs' suit should be dismissed on the alternative and independent basis

that they have failed to state a claim under the state and federal causes of action invoked in their

complaint.  See Def.'s Memorandum in Support of Motion to Dismiss ("Def.'s Mem.") at 14-19;

Def.'s Opp'n and Reply at 24-29.  Emphasizing that none of Iraq's arguments turns on factual

disputes, plaintiffs maintain that they are entitled to partial summary judgment under applicable

precedents that establish (1) that this Court has jurisdiction over their claims, and (2) that they

have stated valid claims under state and federal common law.

**A.  Jurisdictional and Prudential Grounds for Dismissal**

The FSIA provides the exclusive basis for obtaining jurisdiction over foreign countries in

United States courts.  See Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993).  Foreign states are

"presumptively immune from the jurisdiction of United States courts," which can assert

jurisdiction only if one of the "specified exception[s]" to foreign sovereign immunity applies.  Id.

Plaintiffs in this case argue that jurisdiction lies under the statutory exception for state sponsors of

terrorism.  That exception divests foreign states of immunity from suits seeking money damages

"for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft

sabotage, hostage taking, or the provision of material support or resources . . . for such an act" where the perpetrator was "an official, employee, or agent of [the] foreign state [who was] acting within the scope of his or her office, employment or agency." 28 U.S.C. § 1605(a)(7). "In enacting this provision," the D.C. Circuit has explained, "Congress sought to create a judicial forum for compensating the victims of terrorism, and in so doing to punish foreign states who have committed or sponsored such acts and deter them from doing so in the future." Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 88-89 (D.C. Cir. 2002).

Section 1605(a)(7) and its neighboring provisions specify which foreign states may be sued and under what circumstances. For one thing, jurisdiction under this section is available only for suits that seek money damages for injuries caused by certain enumerated types of conduct. The statute likewise instructs courts to locate the definitions for the types of qualifying conduct in specific sources. The phrase "hostage taking" at issue here, for example, is to be given the definition found in Article 1 of the International Convention Against the Taking of Hostages, see 28 U.S.C. § 1605(e)(2), which applies the term to "[a]ny person who seizes or detains and threatens to kill, injure or continue to detain another person . . . in order to compel a third party . . . to do or abstain from doing any act as an explicit or implicit condition for release of the hostage." International Convention Against the Taking of Hostages, Dec. 17, 1979, art. 1, T.I.A.S. No. 11,081. Three additional conditions must be met before a party can obtain jurisdiction over a foreign state under the state-sponsored terrorism exception: (1) the foreign state must be one that was designated "as a state sponsor of terrorism . . . at the time the act occurred," (2) the foreign state must be afforded an opportunity to arbitrate claims based on acts that occurred in that state, and (3) the party or the victim must be a United States national. See 28

U.S.C. § 1605(a)(7)(A), (B); <u>see also</u> <u>Price</u>, 294 F.3d at 89; <u>Daliberti I</u>, 97 F. Supp. 2d at 44.

There is no dispute here that plaintiffs have satisfied these threshold conditions. (Indeed, Judge Friedman has already so ruled with respect to their parents. <u>See</u> <u>Daliberti I</u>, 97 F. Supp. 2d at 44-46.) Plaintiffs seek money damages arising from their fathers' detention and imprisonment at the hands of Iraqi officials. Such detention and imprisonment qualifies as "hostage taking" under these circumstances because Iraq used Beaty and Barloon as bargaining chips to extract concessions from the United States government. <u>See id.</u> at 46. At the time Iraq detained and held the men, it was designated as a state sponsor of terrorism. 55 Fed. Reg. 37,793 (Sept. 13, 1990); 31 C.F.R. § 596.201. Beaty and Barloon are United States nationals, as are their children, who attached an offer to arbitrate to their initial complaint in this case. Accordingly, plaintiffs have satisfied all of the prerequisites to obtaining jurisdiction over a foreign state pursuant to the state-sponsored terrorism exception to the FSIA.

Iraq does not argue otherwise. It instead points to developments since the filing of the original complaint and to several legal doctrines that, it contends, counsel against adjudication of plaintiffs' suit. According to Iraq, dismissal is appropriate because (1) the President, acting pursuant to Congressional authorization, has restored Iraq's sovereign immunity for terrorist acts of the prior regime; (2) plaintiffs' suit presents a nonjusticiable political question; (3) adjudication is barred by the recently resuscitated doctrine of foreign-affairs preemption; and (4) resolving plaintiffs' claims would contravene the act-of-state doctrine. All of these interrelated arguments are variations on a common theme - - that permitting plaintiffs to proceed with a lawsuit that could expose the fledgling Iraqi government to millions of dollars in liability runs counter to the foreign-policy interests of the United States and may place the Court in the uncomfortable

position of resolving claims that the Executive Branch does not want resolved in this forum.

As the following discussion reveals, however, the Court's position is awkward not because adjudication of plaintiffs' relatively narrow claims portends grave international repercussions, but rather because Iraq seeks the same result - - dismissal without reaching the merits - - that the Court would be obliged to order had the D.C. Circuit adopted the position advanced by the United States, and accepted by then-Circuit Judge Roberts, in Acree. The Acree decision, as all sides acknowledged at the motions hearing, casts a long shadow over this case. It is therefore with that decision that the Court begins its analysis.

    *1. Restoration of Iraq's Sovereign Immunity*

Iraq and the United States lead with an argument that both know is unavailing: that Presidential Determination 2003-23, which implemented the authority conferred by § 1503 of the EWSAA, restored in part Iraq's sovereign immunity by suspending the application of § 1605(a)(7) to Iraq. See Def.'s Opp'n and Reply at 10; Third Statement of Interest of the United States at 2. Both Iraq and the United States concede, as they must, that the D.C. Circuit in Acree rejected this very argument. 370 F.3d at 51; id. at 60-64 (Roberts, J., concurring in part and concurring in the judgment). The Acree majority acknowledged just how close the question was, but ultimately concluded that § 1503 of the EWSAA was only "aimed at legal provisions that present obstacles to assistance and funding for the new Iraqi Government and was not intended to alter the jurisdiction of the federal courts under the FSIA." Id. at 51. Judge Roberts, on the other hand, argued persuasively in his separate concurrence that the phrase "'[a]ny other provision' should be read to mean 'any other provision,' not, as the majority would have it, 'provisions that present obstacles to assistance and funding for the new Iraqi government.'" Id. at 60 (Roberts, J.,

concurring in part and concurring in the judgment).  Under his interpretation of § 1503, the plain language of that statute authorized the President to make § 1605(a)(7) inapplicable to Iraq, and the Presidential Determination invoking that authority had "ousted the federal courts of jurisdiction" over suits brought under that exception.  Id.

This Court believes that there is considerable force in the Acree concurring opinion, and would be inclined to adopt that position if free to do so.  Nonetheless, this Court remains bound by the Acree majority's interpretation of the EWSAA.  Iraq recognizes as much and asks only that the Court "render a ruling on this jurisdictional issue . . . so that defendant may, if necessary, seek further review of it before the en banc D.C. Circuit or the Supreme Court."  Def.'s Opp'n and Reply at 10.  The Court will do just that, reiterating here that Acree forecloses the argument that the President has made 28 U.S.C. § 1605(a)(7) inapplicable to Iraq and thus partially restored Iraq's sovereign immunity.

### 2.  Political-Question Doctrine

The political-question doctrine, which is "'primarily a function of the separation of powers,'" Schneider v. Kissinger, 412 F.3d 190, 193 (D.C. Cir. 2005) (quoting Baker v. Carr, 369 U.S. 186, 210 (1962)), "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch."  Japan Whaling Ass'n v. American Cetacean Soc., 478 U.S. 221, 230 (1986).  The touchstone for determining whether a case presents a nonjusticiable political question remains the nonexhaustive list of factors set forth by the Supreme Court in Baker v. Carr.  See Bancoult v. McNamara, 445 F.3d 427, 432 (D.C. Cir. 2006).  "Prominent on the surface of any case held to involve a political question," the Court explained,

> is found [1] a textually demonstrable constitutional commitment of the issue to a
> coordinate political department; or [2] a lack of judicially discoverable and
> manageable standards for resolving it; or [3] the impossibility of deciding without
> an initial policy determination of a kind clearly for nonjudicial discretion; or [4]
> the impossibility of a court's undertaking independent resolution without
> expressing lack of the respect due coordinate branches of government; or [5] an
> unusual need for unquestioning adherence to a political decision already made; or
> [6] the potentiality of embarrassment from multifarious pronouncements by
> various departments on one question.

Baker, 369 U.S. at 217.  A court may dismiss a case as nonjusticiable if it finds any one of those

six factors.  See Schneider, 412 F.3d at 194.  At the same time, courts may not shirk their

responsibility of deciding live controversies properly before them "[u]nless one of these [six]

formulations is inextricable from the case," a conclusion that should be reached only after a

"discriminating inquiry into the precise facts and posture of the particular case."  See Baker, 369

U.S. at 217; Bancoult, 445 F.3d at 432-33.

Cases implicating national-security concerns and foreign relations are among those most

likely to present political questions.  As the D.C. Circuit recently put it, these two topics "serve as

the quintessential sources of political questions."  Bancoult, 445 F.3d at 433.  It is not surprising,

therefore, that Iraq places a heavy emphasis on developments since the United States-led invasion

of that country in 2003, including actions taken by the political branches.  Armed with snippets

from the Statements of Interest that the United States has filed in this matter, the text of an

Executive Order designed to protect Iraqi assets, figures as to the cost of reconstruction efforts,

estimates placing Iraq's potential liability in U.S. courts in the hundreds of millions of dollars, and

an obligatory citation to the number of American soldiers fighting there, Iraq insists that

adjudication of plaintiffs' claims would unreasonably burden its recently installed government and

thereby undermine critical U.S. foreign policy interests.  See Def.'s Mem. at 20-25 & n.9; Def.'s

Opp'n and Reply at 10-15.  Such interference with foreign policy goals as articulated by the political branches, Iraq submits, renders this case nonjusticiable under the political-question doctrine.

But despite some broad statements linking the political-question doctrine to any issue that implicates United States foreign policy interests, the Supreme Court has made clear that not "every case or controversy which touches foreign relations lies beyond judicial cognizance."  See Baker, 369 U.S. at 311; Japan Whaling Ass'n, 478 U.S. at 229-230; see also Bancoult, 445 F.3d at 435.  The Baker Court itself listed six areas related to foreign affairs in which courts could resolve legal questions notwithstanding the primacy of the political branches.  See 369 U.S. at 212-13.  And in Japan Whaling Ass'n, the Court declined to dismiss on political-question grounds a lawsuit that sought to compel the Secretary of Commerce to declare Japan in violation of an international whaling agreement.  478 U.S. at 230.  Decisions of the D.C. Circuit in the foreign-affairs area, of which there are many in recent years, likewise require a case-specific application of the Baker factors, with a focus "upon 'the particular question posed, in terms of the history of its management by the political branches.'"  Hwang Geum Joo v. Japan, 413 F.3d 45, 49 (D.C. Cir. 2005) (quoting Baker, 369 U.S. at 211).  In its most recent application of the political-question doctrine, the court of appeals further emphasized that the focus must be on the "specific claims" at issue.  Omar v. Harvey, - - F.3d - - , 2007 WL 420137, at *8 (D.C. Cir. Feb. 9, 2007).  This focus conforms to the Supreme Court's oft-quoted reminder that the doctrine "is one of 'political questions,' not one of 'political cases.'"  Baker, 369 U.S. at 217; see also Omar, - - F.3d - - , 2007 WL 420137, at *8 (citing Baker for this proposition).  Hence, Iraq cannot secure dismissal on political-question grounds simply by invoking the foreign-affairs label; a closer examination of

both the "specific claims" brought by plaintiffs and the issues alleged to constitute "political

questions" is required.

That examination, conducted through the lens of the six sometimes-overlapping <u>Baker</u>

factors, <u>see</u> <u>Alperin v. Vatican Bank</u>, 410 F.3d 532, 544 (9th Cir. 2005), reveals that plaintiffs'

claims are "fully justiciable."  <u>See</u> <u>Omar</u>, - - F.3d - - , 2007 WL 420137 at *9.  To begin with,

plaintiffs' claims are more narrow than some of Iraq's rhetoric suggests.  Their claims do not bring

into question the propriety of United States policy toward Iraq either at this moment or at the time

plaintiffs' fathers were taken hostage by the former regime.  Rather, the Third Amended

Complaint seeks monetary damages, pursuant to a well-defined statutory scheme established by

Congress and a developing body of case law in this district, for the emotional distress and loss of

companionship that plaintiffs allegedly suffered when their fathers were detained and held as

hostages over ten years ago.  Moreover, the Court's rulings below further limit the scope of this

case to resolution of a single cause of action.  On the surface, then, this case is similar to the

numerous other suits against state sponsors of terrorism brought under § 1605(a)(7) and uniformly

found to be justiciable.

The next task is to identify with precision the ways in which adjudicating plaintiffs'

surviving claim might infringe on the constitutional prerogatives of the political branches.  At the

motions hearing, counsel for Iraq helpfully clarified the two "policy questions" that Iraq believes

this case implicates and whose resolution supposedly belongs to the political branches, and to the

Executive Branch in particular.  First, Iraq insists that "the Constitution commits to the Executive,

not the judiciary, the critical foreign policy determinations involved in promoting the

reconstruction of Iraq and shielding a now friendly government from potentially crippling liability

for acts of a predecessor dictatorship."  Def.'s Opp'n and Reply at 11.  In other words, it is up to the Executive to decide whether Iraq's new government should face hundreds of millions of dollars in liability for the transgressions of the prior regime.  See Motions Hearing Prelim. Transcript ("Prelim. Tr.") at 27 (describing "the effect of damages liability" on the new Iraqi government as one of the two policy questions).

The second policy question is one that, although lurking in Iraq's filings, defense counsel articulated with precision for the first time at the motions hearing.  Seizing on isolated passages from the United States' First Statement of Interest, and in particular on footnote 9 of that document, Iraq maintains that adjudicating this suit in federal court conflicts with the United States' longstanding foreign policy of resolving the existing tort claims of its nationals via state-to-state negotiations with a formerly hostile, but now friendly, regime.  Prelim. Tr. at 22-23, 27, 30. As for the footnote in question, it was written in the specific context of the potential effect of § 1503 of the EWSAA on pending claims and was appended to a paragraph that emphasized the "indisputable authority" of the political branches "to terminate claims that stand as an obstacle to achieving the Nation's foreign policy goals."  First Statement of Interest at 16.  The footnote clarifies that the statute and subsequent Presidential Declaration "have not extinguished plaintiffs' claims on the merits," even while insisting that the political branches could "plainly" have done so via a treaty or an Executive Agreement had they so desired.  Id. at 16 n.9 (arguing that the actions of the political branches had the "effect . . . [of] preserv[ing] plaintiffs' claims . . . pending the establishment of a successor government capable of negotiating the diplomatic or other resolution of claims arising from the misdeeds of its predecessor").

Evaluating plaintiffs' specific claims in light of the two policy questions identified by Iraq,

the Court finds "no independent reason why the claims presented . . . raise any warning flags as infringing on the prerogatives of the Executive Branch."  See Sarei v. Rio Tinto, PLC, 456 F.3d 1069, 1082 (9th Cir. 2006) (declining to dismiss under the political-question doctrine a suit by residents of Papa New Guinea against an international mining company).  The first policy question centers on the possibility that a hefty damages award in this case and others similar to it could saddle the fledgling Iraqi government with an unmanageable debt.  Iraq's argument on this point, however, puts the cart before the horse, focusing on a possible outcome of plaintiffs' suit rather than on the actual process of adjudicating the one claim properly before the Court. Plaintiffs' lawsuit has the potential to implicate United States foreign policy only if Iraq is found liable and then only to the extent that monetary damages are assessed against it.  In other words, plaintiffs' suit could indirectly affect the United States' ongoing efforts to stabilize the new Iraqi government only in so far as it seriously impacts the Iraqi fisc.  But the D.C. Circuit has consistently stated - - and recently reaffirmed - - that "an indirect effect on foreign affairs [does] not automatically render a case nonjusticiable."  Bancoult, 445 F.3d at 435 (citations omitted). The single claim that this Court would be adjudicating does not on its face present a political question, and can be viewed as implicating foreign affairs in only the "indirect" way that all damages actions under the FSIA do: by creating the potential for a significant judgment against a foreign state.

Adjudication of this suit also has little to do with Iraq's second asserted policy question - - the wisdom and/or viability of state-to-state negotiations to resolve existing tort claims.  Some three years after the United States filed its First Statement of Interest in this case, there remains no indication whatsoever that the Executive Branch has begun seeking via diplomatic means a

remedy for these particular plaintiffs or those similarly situated to them.  It is likewise unclear

when and if Iraq will develop "a successor government capable of negotiating the diplomatic or

other resolution of claims arising" from the Saddam Hussein regime.  <u>See</u> First Statement of

Interest at 16 n.9.  Events in Iraq change daily, and neither counsel for Iraq nor the United States

has provided any assurances that the United States' three-year-old intention to resolve outstanding

tort claims diplomatically has advanced beyond just that: an abstract intention.  <u>See</u> <u>Gross v.</u>

<u>German Found. Indus. Initiative</u>, 456 F.3d 363, 380, 390-91 (3d Cir. 2006) (declining to dismiss

on political-question grounds in part because there was no evidence "that the United States

government is engaged in any form of diplomacy or negotiations" to resolve the issue at the heart

of the plaintiffs' claims); <u>Alperin</u>, 410 F.3d at 549-50, 558 (emphasizing, in refusing to dismiss on

political-question grounds claims against a foreign bank, that the plaintiffs' "lawsuit is the only

game in town" and there were "[n]o ongoing government negotiations, agreements, or settlements

. . . on the horizon").  Accepting this latest iteration of Iraq's political-question argument, in short,

would require nothing less than a judicial act of faith - - one that would leave the availability of a

remedy for these plaintiffs to the vagaries of Iraq's internal struggles and the mere possibility that

the Executive Branch will one day undertake negotiations that it has not initiated during the

course of either this litigation or the consolidated cases pending before another member of this

court.  <u>See</u> <u>Vine v. Republic of Iraq</u>, Civ. A. Nos. 01-2674, 03-0691, 03-0888 (HHK).  So long as

the diplomatic solution hinted at by Iraq and the United States remains more fantasy than reality,

there is no direct conflict between American foreign policy and adjudication of the particular

claims at issue here.  <u>See</u> <u>Gross</u>, 456 F.3d at 387 ("The mere existence of the Executive's power to

extinguish claims . . . , without an exercise of that power, does not render those claims

nonjusticiable by virtue of being committed to a co-equal branch.").

A recent decision in the ongoing Vine litigation provides further support for rejecting Iraq's political-question argument.  The plaintiffs in Vine are United States citizens who were allegedly detained, barred from leaving the country, and in some cases tortured, during Iraq's invasion of Kuwait in 1990.  See Vine v. Republic of Iraq, 459 F. Supp. 2d 10, 14-15 (D.D.C. 2006).  Iraq argued in Vine that "the question of its liability in these [consolidated] cases . . . presents a nonjusticiable political question, primarily because any decision to award plaintiffs compensation would undermine the efforts of the President and Congress to create a stable Iraq." Id. at 20 (citation and quotation marks omitted).  Judge Kennedy rejected this argument.  He first clarified that the plaintiffs' specific claims did "not require an evaluation of any executive or congressional policy decision or value judgment."  Id.  On the contrary, he explained, the cases "involve[d] the liability of a foreign sovereign under a well-defined statutory scheme - - a statutory scheme that was enacted by both houses of Congress and signed by the President."  Id. Finally, Judge Kennedy rejected the contention that the dramatic changes in the United States' policy toward Iraq justified dismissal.  The language of § 1605(a)(7), he noted, conferred on the federal courts jurisdiction over claims against foreign states who were designated as sponsors of terrorism "at the time the [terrorist] act occurred," signaling Congress's intent to allow suits "against even those foreign nations whose sponsorship of terrorism ceases."  Id.; see also Kilburn v. Republic of Iraq, 441 F. Supp. 2d 74, 78 (D.D.C. 2006) (concluding that Libya, despite a Presidential Determination ending its status as a state sponsor of terrorism, was still amenable to suit under § 1605(a)(7)), sum. aff'd, 2006 U.S. App. LEXIS 26051 (D.C. Cir. Oct. 19, 2006); Owens v. Republic of Sudan, 374 F. Supp. 2d 1, 27 n.27 (D.D.C. 2005) (noting that "Congress

has chosen to condition an action under section 1605(a)(7) on whether the foreign state was a designated country at the time of the events at issue (and not at the time of the suit)").  The Vine court thus "decline[d] to 'convert what is essentially an ordinary tort suit into a nonjusticiable political question' merely because its claims 'arise in a politically charged context.'"  459 F. Supp. 2d at 20 (quoting Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44, 49 (2d Cir. 1991)).

Iraq assails the Vine decision as resting on the mistaken premise that the FSIA's express statutory grant of jurisdiction necessarily outweighs case-specific foreign-policy concerns that counsel against adjudication.  Def.'s Opp'n and Reply at 13-14.  It is certainly true, as Iraq contends, that the political-question doctrine applies in suits brought pursuant to the FSIA.  See, e.g., Hwang Geum Joo, 413 F.3d at 48-49 (dismissing on political-question grounds a suit asserting jurisdiction under the FSIA's commercial-activity exception); see also Baker, 369 U.S. at 198 (describing the distinction between lack of subject-matter jurisdiction and nonjusticiability as "significant").  But Judge Kennedy did not rule otherwise in Vine.  Rather, he reasoned that the indirect relationship between the plaintiffs' suit and United States foreign policy in Iraq could not offset the judgment of the political branches that a foreign nation may be sued in U.S. courts for its terrorist acts even if that nation had stopped sponsoring terrorism by the time of the suit.  See 459 F. Supp. 2d at 20.  The cases cited by Iraq support its general point that the political-question doctrine applies in cases where jurisdiction lies under the FSIA.  See Whiteman v. Dorotheum GMBH & Co. KG, 431 F.3d 57, 74 n.18 (2d Cir. 2005) (commercial-activity and expropriation exceptions to FSIA); 767 Third Ave. Assoc. v. Consulate General of Socialist Federal Republic of Yugoslavia, 218 F.3d 152, 162-63 (2d Cir. 2000) (commercial-activity exception); Anderman v. Federal Republic of Austria, 256 F. Supp. 2d 1098, 1111 (C.D. Cal. 2003) (commercial-activity

and expropriation exceptions).  But those cases, none of which addresses the state-sponsored

terrorism exception, in no way undermine the Vine court's analysis, which draws from the text

and structure of § 1605(a)(7) the reasonable inference that the political branches were both aware

that suits would continue after regime changes and intended that such suits be permitted.  In sum,

the reasoning employed and conclusion reached in Vine are sound and apply with equal force

here.

     This Court's independent application of the six Baker factors leads it to the same

conclusion that Judge Kennedy reached in Vine.  The first Baker factor - - whether there has been

a "textually demonstrable constitutional commitment of the issue[s in the case] to a coordinate

political department," 369 U.S. at 217 - - has been read as perhaps the most important of the six.

See Vieth v. Jubelirer, 541 U.S. 267, 278 (2004) (plurality opinion) (opining that the six factors

"are probably listed in descending order of both importance and certainty").  Resolution of the

narrow issues before the Court here has not been "constitutional[ly] commit[ted]" to either of the

other branches of government.  As Judge Kennedy properly recognized in Vine, this Court need

not evaluate "any executive or congressional policy decision or value judgment" in order to

adjudicate plaintiffs' claims.  459 F. Supp. 2d at 20.  What the Court must instead do is implement

the "policy decision" and "value judgment" that the political branches made when they stripped

state sponsors of terrorism of sovereign immunity for conduct that was likewise clearly defined in

a statute passed by Congress and signed by President Clinton.  See 28 U.S.C. § 1605(a)(7); see

also Ungar v. Palestine Liberation Org, 402 F.3d 274, 280 & n.4 (1st Cir. 2005) (explaining that

"[t]he very purpose" of both the FSIA and the Anti-Terrorism Act of 1991 was "to allow the

courts to determine questions of sovereign immunity under a legal, as opposed to a political,

regime") (emphasis added).  Applying standards set forth in a duly enacted statute that represents the considered judgment of the political branches is a quintessential task undertaken by the federal courts.  As the Second Circuit put it in another "politically charged" case that was at bottom "an ordinary tort suit," "[t]he department to whom this issue has been 'constitutionally committed' is none other than our own - - the Judiciary."  Klinghoffer, 937 F.2d at 49.

Iraq's argument to the contrary founders for two reasons: it loses sight of the narrow issues in this suit, and it attempts an end-run around the D.C. Circuit's decision in Acree.  Iraq places heavy emphasis on the contention that the Constitution places decisions concerning the liability of a now-friendly regime for the acts of its predecessor in the hands of the Executive Branch and removes these decisions from judicial cognizance.  See Def.'s Opp'n and Reply at 11.  While it is certainly true as a general matter that the Executive Branch is the first mover in the international arena, Iraq fails to explain how this Court would be making any critical foreign policy determinations simply by reaching the merits of plaintiffs' tort claims.  Iraq's position once again confuses the United States' general interest in ensuring the new Iraqi government's financial stability with the nature of this Court's task in adjudicating the specific claims presented in this case.  Put differently, Iraq focuses not on "political questions" that would have to be addressed in resolving plaintiffs' specific claims, but instead on the possibility that an eventual monetary judgment against it could undermine United States foreign policy.  If what converts an otherwise justiciable suit into a nonjusticiable political question, however, is the mere possibility of a "crippling" monetary judgment against Iraq, then all suits against Iraq, including those under the FSIA's commercial-activity exception, would likewise have to be dismissed as presenting nonjusticiable political questions.

Counsel for Iraq argued otherwise at the motions hearing, insisting that a suit alleging tortious misdeeds brought pursuant to § 1605(a)(7) is different from a dispute of a commercial nature.  If this were a contract case, counsel contended, the foreign-policy concerns would not be the same because the policy of the United States "has been not to negotiate contract claims on a state-to-state basis."  Prelim. Tr. at 24.  "But with regard to claims of tortious misconduct committed against its citizens during an era of hostilities," counsel added, "it has been the uniform policy [of the United States] to negotiate those claims on a state-to-state basis."  Id.  This argument misses the mark for many of the reasons already articulated.  First, there is no indication that the United States has ever acted on a policy of negotiating with the new Iraqi government tort claims arising from mistreatment of U.S. citizens by Saddam Hussein's regime.  Second, Iraq overlooks the enactment of § 1605(a)(7), a federal statute that provides a judicial forum in which plaintiffs can assert claims arising from "tortious misconduct committed . . . during an era of hostilities."  See id.  The Court can therefore say, much as the First Circuit recently did in refusing to invoke the political-question doctrine, that this case "is a tort suit brought under a legislative scheme that Congress enacted for the express purpose of providing a [judicial forum] for injuries or death occasioned by acts of international terrorism" perpetrated by foreign states.  See Ungar, 402 F.3d at 280; see also Price, 294 F.3d at 88-89 (explaining that Congress via § 1605(a)(7) "sought to create a judicial forum for compensating the victims of terrorism, and in so doing to punish foreign states who have committed or sponsored such acts and deter them from doing so in the future").  Iraq does not account for the distinct possibility that § 1605(a)(7) represents not just a barren jurisdictional provision, but also a conscious break from both traditional theories of foreign sovereign immunity and the "uniform policy" of state-to-state negotiations with now-

friendly regimes that Iraq believes the United States has long maintained.  The Court declines to allow the aspiration that state-to-state negotiations will someday be possible to trump the clear expression of political will embodied in § 1605(a)(7).

Iraq also fails to account fully for the D.C. Circuit's ruling in Acree.  Were this Court to dismiss plaintiffs' claims as nonjusticiable - - ostensibly on the theory that the Executive has expressed the intent to terminate Iraq's exposure under § 1605(a)(7) and shield Iraqi assets from seizure - - it would effectively be conferring on the Presidential Determination the precise legal effect that the D.C. Circuit has held it does not have.  Counsel for Iraq acknowledged as much at the motions hearing.  See Prelim. Tr. at 8-9 ("So the result that we are seeking is exactly the same result that a) counsel for the United States is urging and will urge in the future, and b) that the President took action to do."); id. at 9 (stating that Iraq's foreign-affairs arguments "are different means of reaching that result").  To be sure, the Court would not be expressly ruling that the Presidential Determination, in combination with the EWSAA, divests it of subject-matter jurisdiction.  But the result, and to some extent the rationale, would be virtually indistinguishable: that the Executive's view on the wisdom of shielding Iraq from liability under the state-sponsored terrorism exception requires dismissal of plaintiffs' claims before reaching the merits.  Cf. Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp., 549 U.S. __, Slip. Op. at 7 (2007) ("Dismissal short of reaching the merits means that the court will not 'proceed at all' to an adjudication of the cause.").  Accepting Iraq's argument on this point, then, would grant Iraq the very relief that it was denied in Acree.  And that would likely be true in this case as well as all others brought against Iraq under § 1605(a)(7), since all such cases implicate the same two foreign-policy concerns - - the potential for "crippling" monetary judgments and interference with

state-to-state negotiations. The Court is reluctant to dismiss plaintiffs' suit on the basis of an

argument that smacks of an attempt to end-run Acree and that would render the court of appeals'

decision in that case effectively a nullity.

Having concluded that the first and most important Baker factor does not support

dismissal, the Court will now address the remaining factors more rapidly. The second factor - -

the absence of "judicially discoverable and manageable standards," see 369 U.S. at 217 - - is no

hurdle to adjudication of plaintiffs' suit. Plaintiffs' surviving claim will be resolved by applying

the firmly established requirements of a federal statute (the FSIA) and the principles that courts in

this district have developed for resolving claims under the FSIA's state-sponsored terrorism

exception. To the extent that plaintiffs' surviving claim sounds in state tort law, the Court will

apply eminently "manageable standards" in the form of state common law, which "provides clear

and well-settled rules on which [the Court] can easily rely." Klinghoffer, 937 F.2d at 49.

The third and fifth Baker factors are likewise inapposite. "Adjudicating [the] discrete

issues" raised by plaintiffs' suit "will not require the [C]ourt to make pronouncements on foreign

policy," Alperin, 410 F.3d at 555, which the Court recognizes is something best left to the

political branches. Plaintiffs' suit can be resolved without this Court making "an initial policy

determination of a kind clearly for nonjudicial discretion," Baker, 369 U.S. at 217, because in

adjudicating this suit, the Court will be honoring precisely the "policy determination" that

"nonjudicial" (i.e., political) officials made when they enacted 28 U.S.C. § 1605(a)(7). Indeed,

the enactment of § 1605(a)(7), no less that the Presidential Determination on which Iraq places so

much weight, is a "political decision already made" to which the Court must "adhere" in this case.

See Baker, 369 U.S. at 217; see also Owens, 374 F. Supp. 2d at 28 (acknowledging that the issue

of "whether suit should be allowed against [a foreign state] is certainly one that touches on the relationship between the United States and other nations, a concern that is primarily committed to the discretion of Congress and the President," but declining to apply the political-question doctrine because the political branches had spoken through § 1605(a)(7) and by designating the defendant nation a state sponsor of terrorism).  The President's actions with respect to Iraq, and in particular Determination 2003-23, are of course other "political decisions" implicated by this and all other lawsuits against Iraq under § 1605(a)(7).  But the Court simply cannot accord the same weight to an Executive action that the D.C. Circuit has declared without legal effect as it gives to an unambiguous statute reflecting the political branches' intent that lawsuits of this ilk be resolved in the federal courts.  Hence, the third and fifth Baker factors both militate in favor of adjudicating plaintiffs' suit.

Analysis of the fourth Baker factor - - "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due the coordinate branches," see 369 U.S. at 217 - - requires a more extended discussion.  Central to this analysis are the two substantive Statements of Interest that the United States has filed in this case.  See Whiteman, 431 F.3d at 72 n.17 ("In applying th[e] fourth Baker test, courts have been particularly attentive to the views of the United States Government about the consequences of proceeding with litigation."); Alperin, 410 F.3d at 556 (noting that the views of the State Department, had it "expressed a view, . . . would certainly weigh in evaluating th[e] fourth Baker formulation").  Pointing to recent cases in which the Supreme Court and the courts of appeals have adopted a policy of case-specific deference to the views of the Executive Branch, Iraq maintains that such deference is warranted here and that the Court should honor the United States' view that dismissal of plaintiffs' suit is

appropriate.  See Def.'s Opp'n and Reply at 6-9 n.5, 12 (citing, among others, Sosa v. Alvarez-

Machain, 542 U.S. 692, 733 n.21 (2004), and Republic of Austria v. Altmann, 541 U.S. 677, 702

(2004)).  The Supreme Court in Altmann, a FSIA case, acknowledged that the State Department

could "fil[e] statements of interest suggesting that courts decline to exercise jurisdiction in

particular cases implicating foreign sovereign immunity," and hinted that such statements "might

well be entitled to deference as the considered judgment of the Executive on a particular question

of foreign policy."  541 U.S. at 701-702.  In Sosa, the Court cited Altmann with approval in

suggesting that courts employ "a policy of case-specific deference to the political branches" where

adjudication in United States courts threatens to undermine American foreign policy.  542 U.S. at

733 n.21.  But because such "case-specific deference" was unnecessary to resolve the issues in

both Altmann and Sosa, the Supreme Court did not flesh out the level of deference owed or

indicate just what submissions of the Executive Branch were entitled to heightened deference.

       This Court does not have such a luxury in the present case, and will have to decide

whether the Statements of Interest filed by the Department of Justice are entitled to the substantial

weight that Iraq places on them.  Having carefully reviewed both Statements and the relevant

post-Altmann/Sosa precedents, the Court concludes that the Statements cannot be read to support

a finding of nonjusticiability.  Two primary considerations inform the Court's conclusion: (1) the

precise content of the Statements of Interest, including the purpose for which and context in which

they were filed; and (2) the Department of Justice's declination, despite the opportunity to do so,

to take a position on the questions of justiciability that Iraq has raised in seeking dismissal.  The

United States' Statements of Interests cover a limited subject matter and were filed for a limited

purpose.  Furthermore, the deference due a statement filed by the Executive Branch does hinge in

large part on the thoroughness of the statement and of the representations made therein, including whether the Executive supports dismissal of the suit and on what grounds.  See, e.g., Presbyterian Church of Sudan v. Talisman Energy, Inc., Civ. A. No. 01-9882, 2005 WL 2082846, at *3 (S.D.N.Y. Aug. 30, 2005) ("Courts have assigned varying weight to statements of interest by the United States Government according to the circumstances.").  The Court is thus entitled to - - and will - - place significant weight on the Executive Branch's refusal to support dismissal of this suit specifically on political-question grounds.

Turning first to the content and purpose of the Statements of Interest, counsel for the United States reiterated at the motions hearing what was already clear from the government's filings: that the United States entered this case primarily "to defend [a] specific act of the President" and "to bring [a] threshold jurisdictional issue to the Court's attention" at a time when Iraq had not yet appeared in the case.  Prelim. Tr. at 59-60; see Third Statement of Interest at 1 (explaining that the United States filed a statement pursuant to 28 U.S.C. § 517 because of its interests in restoring Iraq's sovereign immunity and in enforcing federal laws).  It is not surprising, then, that its Statements of Interest advocate dismissal exclusively on the theory rejected by the D.C. Circuit in Acree: that Presidential Determination 2003-23 and the EWSAA divested this Court of subject-matter jurisdiction.  The United States' first Statement of Interest, filed on March 15, 2004, elaborated on essentially three points: (1) that the Presidential Determination, made pursuant to section 1503 of the EWSAA, had rendered the state-sponsored terrorism exception inapplicable to Iraq effective immediately; (2) that the district court's assertion of jurisdiction in Acree v. Republic of Iraq, 276 F. Supp. 2d 95 (D.D.C. 2003), had been in error; and (3) that, even if the Court rejected the United States' jurisdictional argument, plaintiffs had failed to state a

claim under Ciccipio-Puleo.  Nowhere in its Statement did the United States contend that plaintiffs' claims were nonjusticiable or that their suit would have presented an irreconcilable conflict with American foreign policy even in the absence of the Presidential Determination and the EWSAA.  In short, the United States' Statement of Interest did not say, "here are the foreign-policy reasons why the Executive Branch is worried about continued adjudication of this specific case"; it said something closer to, "here are the foreign-policy reasons why the President and Congress took a series of actions in 2003."

Recognizing as much, Iraq plucks various sentences out of context in an effort to emphasize the extent to which lawsuits against it could, as a general matter, "significantly interfere with the establishment of a new, peaceful government."  Def.'s Opp'n and Reply at 7 (quoting First Statement of Interest at 13).  But these and other statements cited by Iraq cannot be unmoored from that specific context, one in which the United States was simply attempting to explain why giving "immediate effect [to] Section 1503 and the Presidential Determination is entirely consistent with the[] underlying foreign policy objectives" of the political branches.  First Statement of Interest at 10.  The United States' description of those "foreign policy objectives" cannot be read as an implicit request by either the Executive Branch generally or the State Department specifically that the Court decline to exercise jurisdiction in this case.  But without precisely such an indication of how this particular case - - as opposed to a class of suits - - could substantially interfere with the United States' foreign-policy interests, the Court cannot invoke the "case-specific" deference suggested by Sosa and Altmann.  See Altmann, 541 U.S. at 702 ("[S]hould the State Department choose to express its opinion on the implications of exercising jurisdiction over particular petitioners in connection with their alleged conduct, that opinion might

well be entitled to deference as the considered judgment of the Executive on a particular question of foreign policy.") (emphasis in original); see also Presbyterian Church of Sudan, 2005 WL 2082846, at *6 (reading Altmann and Sosa as establishing that "deference is appropriate to the extent that a sovereign's opinion has been stated with particularity").

If there were any doubt about the contours of the Executive Branch's position, that doubt would be dispelled by the United States' Third Statement of Interest, in which it explicitly declined to take a position on the political-question, foreign-affairs-preemption, and act-of-state arguments that Iraq has raised in its most recent filings.  This recent Statement of Interest, weighing in at less than three pages, reasserts the government's position that, notwithstanding the D.C. Circuit's decision in Acree, "the combined legislative and executive action that rendered Section 1605(a)(7) of the FSIA inapplicable to Iraq" divests this Court of jurisdiction.  Third Statement of Interest at 2.  In the remaining sentences, the United States "also reiterates the crucial foreign policy interests underlying those political actions," identifying "the promotion of a peaceful, stable, and democratic Iraq [as] a fundamental goal of U.S. foreign policy," and pointing to the President's view that judicial process against Iraq threatens that policy.  Id. at 3.  As Iraq itself recognizes, however, the United States expressly declined to take a position on "any other issues raised by the parties," id. - - a category that includes Iraq's arguments that this suit should be dismissed as nonjusticiable, preempted, or barred by the act-of-state doctrine.  That silence, particularly in light of foreign-policy interests that are supposedly "crucial," is significant.

Counsel for Iraq has gamely attempted to downplay the significance of the United States' refusal to advocate dismissal on foreign-policy grounds.  See Prelim. Tr. at 31, 64-65.  Iraq is certainly correct that courts normally defer to the Executive Branch's exposition of its foreign-

policy interests, not to its legal conclusions.  See, e.g., Altmann, 541 U.S. at 701-02; Sarei, 456

F.3d at 1080 n.8.  On the other hand, Iraq misconceives the distinction drawn in Altmann and

other cases between the foreign-policy views of the Executive Branch and the Executive's "legal

conclusions."  Altmann itself is instructive in this regard.  There, the Supreme Court rejected the

"recommendation" of the Executive Branch that the FSIA not be applied to conduct that pre-dated

the statute's enactment.  541 U.S. at 701.  In so ruling, the Court explained that the view of the

United States on "a pure question of statutory interpretation" was "of considerable interest," but

did not deserve the same kind of "special deference" to which the view of the State Department

"on the implications of exercising jurisdiction over particular petitioners in connection with their

alleged conduct" might be entitled.  Id. at 701-02 (citing Immigration & Naturalization Serv. v.

Cardoza-Fonseca, 480 U.S. 421, 446, 448 (1987)).  The Altmann Court thus reaffirmed that no

"special deference" is owed the Executive's views on a pure question of law, but neither said nor

hinted that it is improper for courts to focus on whether the foreign-policy concerns that prompt

the Executive Branch to express its views are strong enough to lead the Executive also to seek

dismissal of the suit.

Various pre- and post-Altmann decisions confirm that courts are much more likely to

dismiss a case based on the Executive Branch's assertion of important foreign-policy interests

when the Executive actually advocates for dismissal on that basis.  Recent decisions by the Third

and Ninth Circuits have found the refusal of the Executive Branch to seek dismissal, when it had

the opportunity to do so, significant if not dispositive.  See Sarei, 456 F.3d at 1080-82; Gross, 456

F.3d at 385.  Gross was one in a line of cases in which victims (or heirs of victims) of atrocities

during the Nazi era sued German companies for labor abuses, appropriation of private property,

and refusal to pay insurance policies.  Id. at 366.  The specific issue before the Third Circuit was

whether the district court had erred in dismissing as nonjusticiable a suit seeking interest

payments on money paid by German companies to a foundation that had been established to

compensate the victims.  In dismissing the suit, the district court relied on two letters from the

Executive Branch: an undated letter from Deputy Secretary of State Richard Armitage to a

German official on the foundation's board of trustees, and a letter submitted to the court by a

Department of Justice trial attorney.  Id. at 372-74.  While the Armitage letter expressed the view

that the dispute was better resolved diplomatically than judicially, it did not take a position on the

merits of the dispute.  Id. at 373.  The Justice Department's letter, the only one filed with the

federal courts, was even more barebones, remaining silent on the issue of justiciability and

expressly disclaiming a position on the merits.  Id. at 374.

The Third Circuit concluded that the suit did not present a nonjusticiable political

question.  Central to that conclusion was the court's ruling that neither letter was entitled to case-

specific deference.  456 F.3d at 384.  The court of appeals emphasized that the Armitage letter had

not been directed to a United States court, that it made "no promises to seek dismissal or that the

United States Executive would intervene," and that it took no position on the merits of the

plaintiffs' lawsuit.  Id.  The second letter fared no better.  It was, the court noted, "from a

Department of Justice trial attorney and not from a State Department official."  Id.  Furthermore,

that attorney "was silent on the position of the United States as to justiciability and the proper

forum in which to resolve the dispute."  Id.  The two letters revealed only that "the United States

ha[d] declined to express to the District Court or [the court of appeals] a position on the

justiciability or merits of the 'interest' dispute, except its lack of a position."  Id. at 385.  And

because the United States had failed to do so, the court concluded that the "Executive [Branch] has not, through an expression of its interest in the case, committed the 'interest' dispute to a political branch."  Id.

The Ninth Circuit's decision in Sarei, issued just days after Gross and later cited with approval by the D.C. Circuit, see Doe v. Exxon Mobil Corp., 473 F.3d 345, 354-55 (D.C. Cir. 2007), is to the same effect.  In Sarei, the court of appeals reversed a district court decision that had dismissed on political-question grounds a suit filed by former residents of Papa New Guinea under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350.  The State Department had filed a Statement of Interest that, while declining to take positions on the political-question and act-of-state issues raised by the defendant, expressed the United States' view that adjudication threatened "very grave" consequences for American foreign policy.  456 F.3d at 1075-76.  Although according "serious weight" to the Statement of Interest," the Ninth Circuit held that the filing did not establish any of the final three Baker factors.  Id. at 1082.  Of particular significance to the court was the fact that "[t]he State Department explicitly did not request that [it] dismiss this suit on political question grounds."  Id.; cf. Presbyterian Church of Sudan, 2005 WL 2082846, at *6 (refusing to dismiss an ATS suit under the political-question doctrine, and finding significant the brevity of the Executive Branch's filing because the State Department "has not hesitated to warn courts where it believes continuation of a lawsuit will affect a foreign government's policy to the extent that it would disturb U.S. relations with that foreign government").  "[W]e are confident," the Sarei court explained, "that proceeding does not express any disrespect for the executive, even if it would prefer that the suit disappear."  456 F.3d at 1082.

Although it has not definitively decided the issue, the D.C. Circuit has also recently

indicated that it too believes that the level of deference due a Statement of Interest turns on whether the Executive Branch merely voices foreign-policy concerns or instead directly requests that a suit be dismissed as nonjusticiable.  See Doe, 473 F.3d at 354.  One of the questions in Doe was whether Exxon Mobil could obtain mandamus relief on the ground that the district court had "clearly and indisputably exceeded its jurisdiction by refusing to dismiss th[e] case under the political question doctrine."  Id. at 349, 353 (citations, quotation marks, and alterations omitted).  Exxon argued that the district court had erred by declining to defer to a letter in which the State Department's Legal Advisor expressed concerns about the suit's impact on relations between the United States and Indonesia.  The D.C. Circuit rejected "Exxon's contention that there is a conflict between the views of the State Department and those of the district court."  Id. at 354.  Pointing to language in the letter that revealed the tentative nature of the State Department's views, the court read the letter "not as an unqualified opinion that this suit must be dismissed, but rather as a word of caution to the district court alerting it to the State Department's concerns."  Id.  Because "the State Department did not necessarily expect the district court to immediately dismiss the case in its entirety," the court reasoned, there was no need to "decide what level of deference would be owed to a letter from the State Department that unambiguously requests that the district court dismiss a case as a non-justiciable political question."  Id.  The D.C. Circuit thus signaled its view that there is in fact a difference between the "level of deference" owed an Executive Branch filing "that unambigously requests" dismissal under the political-question doctrine and a filing that merely alerts a court to the possibility that a pending suit, depending on its scope and outcome, could affect American foreign-policy interests somewhere down the road.

    This reading of Doe, Gross, and Sarei is consistent with the reasoning of and results in the

cases cited by Iraq.  Indeed, the cases cited by Iraq illustrate the corollary to the principle explained in the preceding paragraphs - - namely, that courts are especially likely to defer to an Executive Branch explanation of foreign-policy interests when that explanation comes in the form of a filing seeking dismissal on foreign-policy grounds.  Thus, the Second Circuit in Whiteman v. Dorotheum GMBH & Co. KG, 431 F.3d 57, 63 (2d Cir. 2005), dismissed under the political-question doctrine a suit that the United States described as the final case preventing an Executive Agreement with Austria from taking effect.  There, however, the supplemental Statement of Interest jointly filed by the Departments of State and Justice explicitly averred that it was "in the foreign policy interests of the United States for this action to be dismissed on any valid legal ground."  Id. (quoting U.S. Supplemental Letter at 6) (emphasis added).  The letter went on to note a recent decision in which the Eleventh Circuit had dismissed a similar suit under the doctrine of international comity, and implored the Second Circuit to give deference to the articulated foreign-policy interests in considering dismissal under any of "several abstention doctrines" or any other "legal arguments advanced by the defendants in seeking dismissal."  U.S. Supplemental Letter at 6, 8.  Another Second Circuit decision cited by Iraq, 767 Third Ave. Assoc. v. Consulate General of Socialist Federal Republic of Yugoslavia, 218 F.3d 152, 160 (2d Cir. 2000), fits the same pattern.  In affirming the district court's dismissal of a suit involving the by-then-dissolved Republic of Yugoslavia, the Second Circuit relied in part on an amicus brief in which the United States had specifically invoked the political-question doctrine in seeking outright dismissal of the case.  See id.; see also Brief for Amicus Curiae United States of America Supporting Appellees, 767 Third Ave. Assoc. v. Consulate General of Socialist Federal Republic of Yugoslavia, 218 F.3d 152 (2d Cir. 2000) (99-9011).

The most relevant example of this trend is the primary D.C. Circuit authority upon which Iraq relies - - the decision in Hwang Geum Joo, 413 F.3d at 48-52.  There, the court of appeals dismissed on political-question grounds a suit by women who claimed that they had been raped and tortured by Japanese soldiers during World War II.  A central issue was whether treaties that Japan had signed with the women's countries of origin had preserved or extinguished the claims of those countries' citizens against Japan.  Id. at 48.  Relying on "a thorough and persuasive Statement of Interest" submitted by the United States, id., the court held that resolution of this issue was a political question because "adjudication by a domestic court not only 'would undo' a settled foreign policy of state-to-state negotiation with Japan, but could also disrupt Japan's 'delicate' relations with China and Korea."  Id. at 52 (quoting United States' Statement of Interest at 34-35).

Because the case was remanded by the Supreme Court for further consideration in light of Altmann, the United States actually submitted two amicus briefs during the course of the Hwang Geum Joo appeal.  Both briefs argued that the plaintiffs' claims were nonjusticiable, the earlier one doing so as an alternative argument and the latter advancing that argument expressly and from the outset.  See Brief for Amicus Curiae the United States of America at 28-29, Hwang Geum Joo v. Japan, 332 F.3d 679 (D.C. Cir. 2003) (No. 01-7169); Supplemental Brief on Remand for Amicus Curiae the United States of America at 9, 11-12, Hwang Geum Joo v. Japan, 413 F.3d 45 (D.C. Cir. 2005) (No. 01-7169).  The Supplemental Brief emphasized what the United States believed to be "the broader question before the [D.C. Circuit]: whether a foreign policy determination that wartime claims against Japan should not be entertained in U.S. courts renders such claims nonjusticiable."  Id. at 11.  Under "similar circumstances," the United States argued

successfully, "courts have consistently held that dismissal is appropriate on political question, international comity, or other doctrinal grounds." Id. at 12; see also id. at 9 (citing the Supreme Court's decision in Baker v. Carr for the proposition that "courts should not second-guess" the Executive's foreign-policy determinations).  In Hwang Geum Joo, as in the other key cases cited by Iraq, the court deferred to the foreign-policy judgment of the Executive Branch in a setting where the Executive had explicitly sought dismissal on justiciability grounds.

A rather simple proposition emerges from this lengthy background: under the fourth Baker factor, the level of deference owed a statement of interest filed by the Executive Branch depends on, among other factors, what the statement actually says; who (i.e., which Executive agency) submitted it; and, perhaps most critically, whether the United States supports dismissal on the basis of the political-question doctrine or other related grounds.  As applied here, these criteria lead inexorably to the conclusion that this case is justiciable.  With respect to content and context, the Statements of Interest never stray from the Justice Department's limited purposes of defending an action by the President and alerting the Court to what was at that time an open and potentially dispositive jurisdictional question.  The passages on which Iraq seizes explain the foreign-policy motives of the political branches - - especially the President - - but do not purport to set forth the views of the State Department as to whether and why adjudicating this particular case would threaten U.S. foreign policy.  See Altmann, 541 U.S. at 702.  Indeed, the fact that the Statements of Interest were filed by the Justice Department, rather than the State Department, serves both to reinforce the limited purposes for which they were submitted and to rebut Iraq's efforts to convert isolated sentences into authoritative declarations of the Executive's views on the foreign-affairs implications of this case.  See Gross, 456 F.3d at 384.

Finally, as Iraq concedes, the Statements of Interest expressly decline to take a position on whether this suit presents a nonjusticiable political question.  The United States has taken a position on only one of the arguments advanced by Iraq, but has declined, despite the Court's invitation, to endorse the view that plaintiffs' suit is nonjusticiable.  Neither the United States' refusal to take a position nor its comments in explaining a no longer viable theory of dismissal mandate the heightened "case-specific" deference that the D.C. Circuit in Hwang Geum Joo accorded the Executive Branch's unequivocal and detailed request that the case be deemed nonjusticiable, 413 F.3d at 48, or that the Second Circuit in Whiteman accorded the Executive's view that the last remaining obstacle to enforcement of an Executive Agreement should be dismissed "on any valid legal ground," 431 F.3d at 63.  This case is instead analogous in all material ways to Gross and Sarei, where the Third and Ninth Circuits declined to dismiss the respective suits on political-question grounds despite treating the United States' expressions of interest with respect.  The same conclusion follows here, where this Court has likewise carefully reviewed and extensively considered the views set forth by the United States in both Statements of Interest and at the motions hearing.  But because the United States has not indicated - - and the Court finds no independent reason to conclude - - that adjudicating plaintiffs' claims would "express[] lack of the respect due the coordinate branches," dismissal under the political-question doctrine on the basis of the fourth Baker factor is inappropriate.  See 369 U.S. at 217.

This leaves the sixth Baker factor and brings the Court back to where this analysis began: the D.C. Circuit's decision in Acree.  The sixth Baker factor gauges the potential for "embarrassment from multifarious pronouncements by various departments on one question."  See 369 U.S. at 217.  There is little doubt that this case implicates that factor.  Congress and the

President spoke with one voice in 1996 when they stripped state sponsors of terrorism of immunity for certain terrorist acts.  A strong argument has been made - - both by the United States and by then-Circuit Judge Roberts in Acree - - that the political branches once again spoke with one voice in seeking to remove Iraq from that disreputable list in 2003.  But the D.C. Circuit has held otherwise, and absent en banc or Supreme Court consideration, or a Congressional response to Acree, every case brought against Iraq under § 1605(a)(7) will present the same cacophony of actions and arguments: an unambiguous statute that provides a judicial forum for victims of terrorism to seek redress for the wrongs they suffered, the President's attempt to restore Iraq's sovereign immunity pursuant to a statute that he believed equally clear, and the court of appeals' ruling that Congress did not give the President the power to throw this suit and similar ones out of the judicial forum that had been created in 1996.  In other words, to the extent that there exists a potential for "embarrassment," that potential stems from the D.C. Circuit's holding that the EWSAA did not give the President the authority that he thinks Congress gave him, not from this Court's adjudication, almost three years after Acree was decided, of the narrow claims advanced by plaintiffs here.  Accordingly, the final Baker factor, although surely implicated, does not weigh in favor of dismissing plaintiffs' suit.

   3.  *Foreign-affairs preemption*

   Iraq next asks the Court to dismiss plaintiffs' claims on the strength of "the doctrine of foreign affairs preemption," which it says "rests on many of the same considerations underlying the political question doctrine."  Def.'s Opp'n and Reply at 15.  The basis for this argument is the Supreme Court's decision in American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003).  That case involved California's Holocaust Victim Insurance Relief Act ("HVIRA"), a state law that required

insurers doing business in California to disclose information about holocaust-era insurance policies.  Id. at 409.  HVIRA also created a private cause of action and extended the statute of limitations for individuals to assert claims "based on acts perpetrated in the Holocaust."  Id.  The primary question before the Supreme Court was whether the state statute was preempted because it conflicted with the federal government's elaborate efforts in the international arena to resolve disputes over the insurance claims of Holocaust survivors.

Answering that question in the affirmative, the Court relied heavily on its decision in Zschernig v. Miller, 389 U.S. 429, 432 (1968), in which an Oregon probate statute prohibiting inheritance by a nonresident alien was invalidated as an "intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress."  The Garamendi majority acknowledged that the lead opinion in Zschernig could be read as standing for the proposition "that state action with more than an incidental effect on foreign affairs is preempted, even absent any affirmative federal activity in the subject area of the state law, and hence without any showing of conflict."  539 U.S. at 418.  But Justice Harlan's separate opinion in Zschernig had declined to go so far, instead endorsing the view that, absent federal action, "the States may legislate in areas of their traditional competence even though their statutes may have an incidental effect on foreign relations."  389 U.S. at 459 (Harlan, J., concurring in the result).  The Garamendi Court deemed it unnecessary, however, to choose between the broader reading of Zschernig and Justice Harlan's more narrow view.  539 U.S. at 419-20 & n.11 (describing the two positions as "complementary," and noting that where states act in their areas of traditional competence, "it might make good sense to require a conflict, of a clarity and substantiality that would vary with the strength or the traditional importance of the state concern asserted").  This was because the

-44-

state statute was preempted even under Justice Harlan's view, since it generated a "clear conflict" with the Executive Branch's efforts to settle claims in the international arena, and the state's interests "in regulating disclosure of European Holocaust-era insurance policies" were relatively weak.  See id. at 421-25.  The California statute, the Supreme Court explained, used "an iron fist where the President has consistently chosen kid gloves," id. at 427, and thus was likely to "produce something more than incidental effect in conflict with express foreign policy of the National Government," id. at 420.

Iraq's reliance on Garamendi is flawed for at least two reasons.  First and foremost, there is a serious question as to whether Garamendi's "conflict" analysis even applies to a case such as this one, where it is a federal statute that establishes the exclusive framework for suing a foreign sovereign and that contemplates that state law will provide the rule of decision.  See 28 U.S.C. § 1606 ("[T]he foreign state shall be liable to the same manner and to the same extent as a private individual under like circumstances.");  Bodoff v. Islamic Republic of Iran, 424 F. Supp. 2d 74, 83 (D.D.C. 2006) (describing § 1606 as "a 'pass-through' to substantive causes of action against private individuals that may exist in federal, state or international law." (citation omitted)).  The Supreme Court has recognized in construing the FSIA that the statute permits - - and indeed may require - - application of state law in suits against foreign sovereigns.  See First Nat. City Bank v. Banco Para el Comercio, 462 U.S. 611, 622 n.11 (1983) ("[W]here state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances.");  cf. Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 491 (1983) (holding that the FSIA did not violate Article III of the Constitution "by granting federal courts subject-matter jurisdiction over certain civil actions . . . against foreign sovereigns where

the rule of decision may be provided by state law").  Iraq has cited no cases, and the Court is

aware of none, in which a federal court has applied the foreign-affairs-preemption doctrine

recognized in Garamendi and Zschernig to a suit brought pursuant to the FSIA.  The sole

post-Garamendi authority cited by Iraq involved claims against two American corporations, such

that the FSIA did not apply.  See Mujica v. Occidental Petroleum Corp., 381 F. Supp. 2d 1164,

1185-88 (C.D. Cal. 2005) (dismissing under the foreign-affairs-preemption doctrine the plaintiffs'

state tort law claims).  There is good reason for this absence of on-point authority: it makes little

sense to describe a state law as "clearly conflicting" with the federal government's foreign policy

when a law enacted by the federal government is what allows plaintiffs to invoke, and instructs

federal courts to enforce, state law causes of action.

     Second, even assuming that the "conflict" framework applies, there are numerous and

critical distinctions between the present case and Garamendi.  For one thing, at issue in

Garamendi was the validity of a state legislative enactment specifically intended to reach sensitive

foreign-policy matters.  Here, conversely, the only state "action" implicated is the Florida and

Oklahoma common law of tort; the existence of such court-created common law evinces no effort

on the part of either of those state governments to weigh in on knotty issues of international

consequence.  Cf. Garamendi, 539 U.S. at 439 (Ginsburg, J., dissenting) ("The notion of 'dormant

foreign affairs preemption' with which Zschernig is associated resonates most audibly when a

state action reflects a state policy critical of foreign governments and involves sitting in judgment

of them." (citation, quotation marks, and alterations omitted)); Doe v. Exxon Mobil Corp., Civ. A.

No. 01-1357, 2006 WL 516744, at *3 (D.D.C. March 3, 2006) (finding Garamendi "simply not

applicable" because "no state government has passed any statute in conflict with U.S. foreign

policy"), appeal dismissed, 473 F.3d 345 (D.C. Cir. 2007).  Iraq downplays the difference between

affirmative state legislative action and the application of state common law, insisting that, "[a]s

with other preemption doctrines, the doctrine of foreign affairs preemption applies equally to state

statutes and state common law causes of action."  Def.'s Opp'n and Reply at 16 n.8.  Maybe so.

But what this argument overlooks is that the common law of tort is plainly an area of "traditional"

state competence.  Under Garamendi, Iraq must identify a "conflict [] of a clarity or substantiality

that [varies] with the strength or the traditional importance of the state concern asserted."  539

U.S. at 419 n.11; see also id. at 427 ("The question relevant to preemption in this case is

conflict.").  And because the concerns underlying the tort of intentional infliction of emotional

distress are "legitimate" and "substantial," see Farmer v. United Brotherhood of Carpenters &

Joiners, 430 U.S. 290, 302-03 (1977), Iraq must demonstrate a similarly "substantial" conflict

between the state tort laws and U.S. foreign policy.

　　　This Iraq cannot do.  There is simply no appreciable conflict between applying state tort

law via § 1606 of the FSIA and American foreign policy as articulated by the federal government.

As was explained in the political-question analysis above, allowing plaintiffs' suit to proceed

cannot unduly interfere with country-to-country negotiations that are at this point more of an

aspiration than a policy.  See Gross, 456 F.3d at 380, 390-91; Alperin, 410 F.3d at 558.

Furthermore, even if the application of state law leads to a judgment against Iraq, the only effect

that this particular case will have is on the Iraqi government's finances.  And if such an effect is

enough to establish a "clear conflict" with American foreign policy, then all suits against Iraq

under the FSIA in which state law provides the rule of decision - - or at a minimum, all suits

brought under § 1605(a)(7) - - would also be preempted.  Nothing in the Garamendi majority's

narrow opinion indicated an intent to mandate such a strange result or to upset settled principles of law in the FSIA context.  See First Nat. City Bank, 462 U.S. at 622 n.11 (acknowledging that state law can and at times must provide the rule of decision via §1606 of the FSIA).

Finally, the present case is quite simply miles away from Garamendi on the facts.  There have not been, as in Garamendi, extensive efforts to resolve claims by former hostages in the international arena.  Cf. Roeder v. Islamic Republic of Iran, 333 F.3d 228, 236-38 (D.C. Cir. 2003) (holding that plaintiffs' FSIA suit was barred by an Executive Agreement that precluded claims by former hostages against Iran); Ibrahim v. Titan Corp., 391 F. Supp. 2d 10, 16 (D.D.C. 2005) (declining to dismiss a suit on political-question grounds where, "unlike in many other reparations cases entangled with political questions, there is no state-negotiated reparations agreement competing for legitimacy with this court's rulings").  The possibility of such extensive efforts at some indeterminate future date is no substitute for the actual diplomatic solution toward which the Executive had worked in Garamendi.

Moreover, to the extent that the application of state common law could be viewed as conflicting with the United States' general interest in stabilizing Iraq, Florida and Oklahoma's interest in seeing their generally applicable tort laws applied to protect their residents is substantial enough to offset such a conflict.  The Supreme Court has recognized the strength and legitimacy of the state interests involved in holding that a state-law cause of action for intentional infliction of emotional distress was not preempted by the federal labor laws.  See Farmer, 430 U.S. at 302-03.  In so ruling, the Court repeatedly pointed to the state's "legitimate" and "substantial interest" in protecting its citizens "from emotional distress caused by outrageous conduct," an interest tied to the states' more general interest "in protecting the health and well-

being of its citizens." See id. at 302, 304.  The tenuous nature of the conflict (if there even is

one), along with the strength of the state interests implicated, distinguishes this case from

Garamendi and suggests that preemption under the foreign-affairs doctrine is inappropriate.

*4.  Act-of-state doctrine*

Iraq's final foreign-affairs salvo is the act-of-state doctrine.  That doctrine bars courts from

adjudicating a case "when 'the relief sought or the defense interposed would [require] a court in

the United States to declare invalid the official act of a foreign sovereign performed within' its

boundaries." World Wide Minerals, Ltd. v. Republic of Kazakhstan, 296 F.3d 1154, 1164 (D.C.

Cir. 2002) (quoting W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp., 493 U.S.

400, 405 (1990)).  "[M]ost recently described . . . as a consequence of domestic separation of

powers, reflecting the strong sense of the Judicial Branch that its engagement in the task of

passing on the validity of foreign acts of state may hinder the conduct of foreign affairs," id. at

1165 (citations and quotation marks omitted), the act-of-state doctrine "provides foreign states

with a substantive defense on the merits." Altmann, 541 U.S. at 700.  "The policies underlying

the doctrine include international comity, respect for the sovereignty of foreign nations on their

own territory, and the avoidance of embarrassment to the Executive Branch in its conduct of

foreign relations." World Wide Minerals, 296 F.3d at 1165 (citations and quotation marks

omitted).  When the factual predicate for the doctrine's application exists, courts decide whether to

invoke it by assessing three factors: (1) the degree of consensus concerning a particular area of

international law, (2) the implications of the issue for the United States' foreign relations, and (3)

whether the government that perpetrated the act or acts at issue is still in existence. See Owens v.

Republic of Sudan, 374 F. Supp. 2d 1, 26 (D.D.C. 2005).

There is no question here that "the factual predicate for application of the act of state doctrine" exists, W.S. Kirkpatrick, 493 U.S. at 405, since plaintiffs' claims center on the propriety of the Iraqi government's detention and imprisonment of Beaty and Barloon within Iraqi territory. See Underhill v. Hernandez, 168 U.S. 250, 254 (1897) (dismissing under the act-of-state doctrine suit in which the plaintiff alleged that he had been unlawfully detained and assaulted by revolutionary forces that the United States later recognized as Venezuela's government).  Hence, the principal issue is "whether the purpose of the act of state doctrine would be furthered by its application in this case." W.S. Kirkpatrick, 493 U.S. at 405; see Sarei, 456 F.3d at 1084.  In addressing that issue, Iraq properly recognizes that both this Court in Owens and Judge Friedman in Daliberti I expressed great skepticism about applying the act-of-state doctrine to suits brought under the FSIA's state-sponsored terrorism exception.  See Owens, 374 F. Supp. 2d at 26-27; Daliberti v. Republic of Iraq, 97 F. Supp. 2d 38, 54-55 (D.D.C. 2000).  This hesitance is rooted in the fact that the political branches enacted a statute whose text and structure expressly contemplate holding a foreign state liable for terrorist acts committed years earlier, and that this statute does not come into play unless the Executive Branch had identified a nation as a sponsor of terrorism at the time of the acts at issue.  See Owens, 374 F. Supp. 2d at 27; Daliberti I, 97 F. Supp. 2d at 55.  Under such circumstances, it is difficult if not impossible to say that the judiciary would be unduly interfering with the political branches' conduct of foreign policy, which is the principal concern underlying the act-of-state doctrine.  See Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 423 (1965); W.S. Kirkpatrick, 493 U.S. at 404.

These justifications for refusing to invoke the act-of-state doctrine in Daliberti I and Owens apply fully here.  Indeed, because the actions underlying plaintiffs' claims are the same

ones already litigated in Daliberti I, Iraq must demonstrate that something is different here.  The

critical difference, it says, is that the regime that perpetrated the acts underlying plaintiffs' claims

is no longer in power, and has been replaced with a new government whose stability and success

are a major foreign-policy objective of the United States.  See Def.'s Opp'n and Reply at 23-24

(quoting Sabbatino, 376 U.S. at 428 ("The balance of relevant considerations may also be shifted

if the government which perpetrated the challenged act of state is no longer in existence . . . , for

the political interest of this country may, as a result, be measurably altered.")); see also Owens,

374 F. Supp. 2d at 26 (listing "whether the government that perpetrated the challenged act is still

in existence" as one consideration for applying the act-of-state doctrine).  Although the existence

of a new government is certainly significant, the Court is not convinced that this single distinction

either (1) offsets the Daliberti I court's reasoning that dismissal "would constitute more of a

judicial interference in the announced foreign policy of the political branches of government than

to allow the suit to proceed under the explicit authorization of Congress,"  97 F. Supp. 2d at 55; or

(2) suffices to justify dismissing a lawsuit that was filed before the regime change and that is

based on the same underlying conduct as was Daliberti.

      This is especially so given the lack of case-specific action on the part of the very political

branches whose "announced foreign policy" the courts attempt to respect.  See id.  The Executive

Branch, despite the President's publicly expressed desire to shield Iraq from liability, has declined

to raise the act-of-state doctrine in its Statements of Interest and has explicitly declined to support

Iraq's invocation of the doctrine.  The out-of-context snippets from those Statements reproduced

by Iraq hardly constitute the "considered judgment" or "opinion" of the State Department "on the

implications of exercising jurisdiction over particular [foreign states] in connection with their

alleged conduct." See Altmann, 541 U.S. at 702; see also id. at 714 (Breyer, J., concurring) (emphasizing that the United States could file statements of interest that refer "not only to sovereign immunity, but also to other grounds for dismissal, such as . . . the nonjusticiable nature . . . of the matters at issue") (citations omitted).  If the regime change were an event so cataclysmic as to mandate a result here contrary to the one in Daliberti, one would expect the Executive Branch, especially when given the chance, to say so explicitly.

To be sure, Iraq is correct that dismissal on act-of-state grounds may be appropriate regardless of the position taken by the Executive Branch.  The Supreme Court has so suggested, see Sabbatino, 376 U.S. at 436, and other courts have gone so far as to raise the act-of-state doctrine on their own either in a default proceeding or when resolution of a case on the merits might embarrass the United States government.  See Liu v. Republic of China, 892 F.2d 1419, 1432 (9th Cir. 1992); Doe v. Qi, 349 F. Supp. 2d 1258, 1290 (N.D. Cal. 2004).  But those situations are easily distinguishable from this case.  Sabbatino itself is a poor analogue because, by the time the case reached the Supreme Court, the Executive Branch had cleared up the ambiguity in its earlier statements by expressly seeking dismissal on act-of-state grounds.  See 376 U.S. at 420; Brief for United States as Amicus Curiae, Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398 (1963) (No. 16), reprinted in 2 I.L.M. 1009 (1963).  Furthermore, as was explained at length above, adjudicating the particular claims in this case is unlikely to cause excessive - - if any - - embarrassment to the United States government.  If such embarrassment were indeed a risk, the Court would certainly have expected the Executive Branch to so indicate when given the chance to do so.  Finally, the additional caution that may be called for in a default proceeding is not warranted here, where Iraq is represented by able counsel.  The Court therefore declines, as it

did in Owens, to dismiss on act-of-state grounds "an action that entails no greater consideration of the acts of a foreign state than any other claim under section 1605(a)(7)."  374 F. Supp. 2d at 28.

**B.  Failure to State a Claim**

Having concluded that plaintiffs' suit need not be dismissed on jurisdictional or prudential grounds, the Court will now take up Iraq's argument that plaintiffs have failed to state a claim upon which relief can be granted.  Iraq contends that Counts II and III of plaintiffs' Third Amended Complaint must be dismissed because federal common law does not furnish a cause of action in cases under the state-sponsored terrorism exception, a conclusion that this Court already reached in Dammarell v. Islamic Republic of Iran, Civ. A. No. 01-2224, 2005 WL 756090, at *23 (D.D.C. March 29, 2005) ("Dammarell II") ("[F]ederal common law should not serve as a rule of decision in the run of section 1605(a)(7) cases.").  At the same time, Iraq asks the Court to reconsider its holding in Dammarell II that state common law can supply a cause of action in suits brought pursuant to § 1605(a)(7).  Because both parties focus on this Court's decision in Dammarell II, a brief review of that decision, and the reasoning underlying the Court's conclusions, is warranted.

*1. The continuing validity of Dammarell II*

This Court in Dammarell II endeavored to answer one of the principal questions left open by the D.C. Circuit's decisions in Ciccipio-Puleo and Acree: what "particular causes of action . . . may be brought against a foreign state in a case proceeding under section 1605(a)(7)."  2005 WL 756090, at *11.  After a thorough "examination of the plain text, the structure, and the legislative history of sections 1605(a)(7) and 1606, and a comparison to the analogous statutory scheme of the [Federal Tort Claims Act]," the Court concluded that "the causes of action that may be brought

against the foreign state . . . include any claims that can be brought against a private individual in like circumstances" - - to wit, claims arising under "state common and statutory law, federal statutory law, and even the law of a foreign state." Id. at *14. Conspicuously absent from the sources of law held to supply cognizable causes of actions was federal common law. The starting point for the Court's conclusion in that regard was the D.C. Circuit's then-recent decision in Bettis v. Islamic Republic of Iran, 315 F.3d 325 (D.C. Cir. 2003). The court of appeals in Bettis, this Court explained, had "cautioned against the creation of a federal common law remedy" in the context of the state-sponsored terrorism exception. 2005 WL 756090, at *23. Indeed, the Bettis court interpreted § 1606 as "in effect instruct[ing] federal judges to find the relevant law, not to make it." 315 F.3d at 333. This Court then reviewed other potential justifications for fashioning federal common law - - predictability and uniformity in an area of law, the existence of interests that are uniquely federal in nature, possible conflicts between state law and federal interests, and the Supreme Court's recognition of an extremely narrow class of federal-common-law claims in Sosa v. Alvarez-Machain, 542 U.S. 692 (2004) - - and determined that none of those justifications overcame the textual and structural mandate of the statute or the general rule against creating federal common law. See 2005 WL 756090, at *28.

 As the parties recognize, Dammarell II both buoys and undermines critical aspects of their respective positions. Iraq points out that the Court's ruling with respect to federal common law spells trouble for two of the three counts in plaintiffs' complaint. On the other hand, the Court's conclusion that state common law can provide a cause of action in cases brought pursuant to § 1605(a)(7) disposes of a principal ground on which Iraq seeks dismissal of Count I and shifts the focus to whether plaintiffs have stated a valid claim for intentional infliction of emotional

distress under Florida and Oklahoma law.  Hence, the question is whether either the arguments advanced by Iraq or jurisprudential developments in the last two years call into doubt the soundness of this Court's reasoning and conclusions in Dammarell II.

The Court answers that question in the negative.  Two primary considerations guide this answer.  For one thing, Iraq's arguments substantially mirror ones that the Court has already considered and rejected.  In other words, Iraq's plea to reevaluate Dammarell II is based not on new information, extant jurisprudence or policy arguments that the Court overlooked, or even intervening case law, but instead on a simple disagreement with the conclusions that this Court reached.  Such disagreement, without more, does not support revisiting a well reasoned decision that has been widely followed.  Indeed, it is precisely the wide acceptance by other judges in this district that provides a second reason for reaffirming the validity of Dammarell II.  In a series of cases brought under § 1605(a)(7), other members of this district court have adopted this Court's reasoning, often explicitly, in concluding both that state law can provide a cause of action and that federal common law cannot.  See, e.g., Blais v. Islamic Republic of Iran, 459 F. Supp. 2d 40, 54 (D.D.C. 2006) (RCL); Vine v. Republic of Iraq, 459 F. Supp. 2d 10, 25-26 (D.D.C. 2006) (HHK); Reed v. Islamic Republic of Iran, 439 F. Supp. 2d 53, 60 (D.D.C. 2006) (RMU); Holland v. Islamic Republic of Iran, Civ. A. No. 01-1924, 2005 U.S. Dist. LEXIS 40254, at *33-*56 (D.D.C. Oct. 31, 2005) (CKK).  This Court's decision in Dammarell II thus represents the prevailing view of judges in this district on at least two critical questions left unanswered by the D.C. Circuit's opinions in Ciccipio-Puleo and Acree.  Until the D.C. Circuit or the Supreme Court rules otherwise, this Court will adhere to the conclusions reached and the reasoning set forth in Dammarell II.  Accordingly, Iraq's request to revisit that decision is rejected.

   2.  *Dammarell II* requires dismissal of Counts II and III

   As was intimated above, Counts II and III of plaintiffs' Third Amended Complaint fail

under Dammarell II.  Count II purports to state a claim for "violations of customary international

law incorporated into federal common law," while Count III asserts a federal-common-law claim

for loss of solatium.  See Third Am. Comp. at ¶¶ 32-40.  Because federal common law cannot

"serve as a rule of decision in . . . section 1605(a)(7) cases," both of these counts fail to state a

claim upon which relief can be granted and must therefore be dismissed.  See Dammarell II, 2005

WL 756090, at *23; see also Vine, 459 F. Supp. 2d at 27; Pugh v. Socialist People's Libyan Arab

Jamahiriya, Civ. A. No. 02-2026, 2006 WL 2384915, at *12-*14 (D.D.C. May 11, 2006);

Holland, 2005 U.S. Dist. LEXIS 40254, at *48-*56.  Count III also fails to state a claim on the

alternative ground that "[s]olatium . . . is not an independent cause of action, but rather is a form

of damages."  See Reed, 439 F. Supp. 2d at 67-68 (citing Salazar v. Islamic Republic of Iran, 370

F. Supp. 2d 105, 115 (D.D.C. 2005) (interpreting Illinois law)).  As such, "[a] defendant cannot be

liable for solatium but can be liable for solatium damages through other causes of action."  Id. at

68 (citing Salazar, 370 F. Supp. 2d at 115).

   In the face of these authorities, plaintiffs cling to two other cases from this district:

Anderson v. Islamic Republic of Iran, 90 F. Supp. 2d 107, 113 (D.D.C. 2000), and Dodge v.

Islamic Republic of Iran, Civ. A. No. 03-0252, 2004 U.S. Dist. LEXIS 29045, at *11-*14 & n.8

(D.D.C. Aug. 25, 2004).  Neither of these decisions suffices to salvage Counts II and III.

Anderson was decided long before the D.C. Circuit dramatically altered the jurisprudence in this

area of the law in Ciccipio-Puleo and Acree, and consequently includes almost no discussion of

the complex issues raised by those cases.  To the extent that the Anderson court's reliance on

federal common law is inconsistent with Dammarell II, this Court declines to follow Anderson. Furthermore, although it was decided after Ciccipio-Puleo, the Dodge case merely asserts without explanation that plaintiffs who bring suit under § 1605(a)(7) "may sue [a foreign] state under any cause of action arising from common law, foreign law, or federal statute which might ordinarily give rise only to individual liability."  2004 U.S. Dist. LEXIS 29045, at *12.  As two other judges in this district have found, that statement is overbroad and fails to give full effect to the holdings of Ciccipio-Puleo and Acree.  See Vine, 459 F. Supp. 2d at 26 n.17; Holland, 2005 U.S. Dist. LEXIS 40254, at *40-*41.  The Dodge decision therefore lacks persuasive value and need not be followed.  For these reasons, the Court will grant in part Iraq's motion to dismiss and will dismiss Counts II and III of plaintiffs' Third Amended Complaint.

   *3.  Count I states a claim upon which relief can be granted*

   Count I of plaintiffs' Third Amended Complaint seeks recovery for intentional infliction of emotional distress (hereinafter "IIED") under state common law.  As Iraq recognizes, this Court in Dammarell II determined that the state law providing the rule of decision is generally the domicile of the plaintiffs at the time of the tortious conduct.  See 2005 WL 756090, at *21; see also Blais, 459 F. Supp. 2d at 54 (same).  Here, the parties appear to agree that the principles of state common law that govern are those of Florida (for the Barloon plaintiffs) and Oklahoma (for the Beaty plaintiffs).  The parties share other common ground as well, acknowledging (1) that the highest courts of both Florida and Oklahoma have accepted the tort of intentional infliction of emotional distress, and (2) that those courts have adopted the definition of and limitations on that tort set forth in the Restatement (Second) of Torts § 46.  Their agreement, however, ends there. Iraq contends that both states strictly enforce the Restatement's so-called "presence" requirement,

and that because plaintiffs were not physically present when their fathers were taken and held as hostages and possibly tortured, they cannot recover for any emotional distress that they may have suffered.  <u>See</u> Restatement (Second) of Torts § 46(2)(a) ("Where such [extreme and outrageous] conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm.").  Plaintiffs respond that the Restatement itself contemplates some exceptions to the presence requirement, <u>see</u> <u>id.</u> Comment l, and point to FSIA cases in this district in which this Court and other judges have relaxed that requirement either explicitly or implicitly.

Indeed, although the parties have framed the decisive issue in terms of the Restatement's "presence" requirement, courts in this district have permitted the close relatives of the victims of terrorist bombings to recover under an IIED cause of action without discussing the presence requirement.  <u>See</u> <u>Dammarell v. Islamic Republic of Iran</u>, 404 F. Supp. 2d 261, 283, 285-86 (D.D.C. 2005) ("<u>Dammarell IV</u>"); <u>Salazar</u>, 370 F. Supp. 2d at 115 n.12 (citing <u>Burnett v. Al Baraka Inv. and Dev. Corp.</u>, 274 F. Supp. 2d 86, 107 (D.D.C. 2003), and <u>Jenco v. Islamic Republic of Iran</u>, 154 F. Supp. 2d 27, 35 (D.D.C. 2001)); <u>Sutherland v. Islamic Republic of Iran</u>, 151 F. Supp. 2d 27, 50 (D.D.C. 2001).  These decisions have endorsed the proposition that terrorist attacks such as bombing an embassy or holding someone hostage for an extended period are by their nature intended to harm not just those injured or killed at the time, but also the families of the injured.  <u>Dammarell IV</u>, 404 F. Supp. 2d at 283; <u>Salazar</u>, 370 F. Supp. 2d at 115 n.12.  In treating close relatives of victims as themselves direct victims of the terrorist attacks, the courts have unmistakably (but only <u>implicitly</u>) applied § 46(1) of the Restatement, which governs

direct victims and which has no presence requirement.  The reasoning that supports treating

absent relatives as direct victims is identical to the reasoning that supports relaxing the presence

requirement.  Accordingly, the Court will focus, as the parties do, on the presence requirement, at

the same time explaining why Count I of plaintiffs' Third Amended Complaint states an IIED

claim upon which relief can be granted under either form of analysis.

The parameters of the state-law inquiry are well settled.  This Court is bound by the

highest state court's construction of state law.  See Wainwright v. Goode, 464 U.S. 78, 84 (1983)

(per curiam) ("[T]he views of the State's highest court with respect to state law are binding on the

federal courts.").  Where the state courts have not addressed a question crucial to the resolution of

a case before it, however, a federal court must answer that question as it believes the highest court

of the state would.  See Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc., 420 F.3d

1317, 1326 n.5 (11th Cir. 2005) (noting that in the absence of binding precedent, the court's

"objective [wa]s to determine issues of state law as [it] believe[d] the Florida Supreme Court

would"); Gibson v. Arnold, 288 F.3d 1242, 1246 (10th Cir. 2002) (explaining that where issue of

Oklahoma law had not been resolved by state courts, the federal court "must predict how the

Supreme Court of Oklahoma would rule").  The Court is faced with just such an unresolved

question of state law in this case - - namely, whether the highest courts of Florida and Oklahoma

would recognize a cause of action for intentional infliction of emotional distress where plaintiffs

who were minors at the time seek to recover for the severe anguish that they allegedly suffered

when their fathers were detained and held as hostages in a foreign country.

In answering this question, the Court is free to "consider whatever might lend it insight,

including relevant state precedents, analogous decisions, considered dicta, scholarly works, and

any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." See Guideone Elite Ins. Co., 420 F.3d at 1326 n.5 (citation and quotations marks omitted); accord Gibson, 288 F.3d at 1246 (noting that the court could "consider all resources available, including decisions of [Oklahoma] courts, other state courts and federal courts, in addition to the general weight and trend of authority") (citation and quotation marks omitted) (alteration in original).  These sources, and in particular previous decisions by this Court and other judges in this district, strongly suggest that Florida and Oklahoma courts would recognize an IIED cause of action under the circumstances of this case, whether by treating these plaintiffs as direct victims or by dispensing with the presence requirement.

Starting with Florida, that state's Supreme Court first recognized the IIED tort in Metropolitan Life Ins. Co. v. McCarson, 467 So.2d 277, 278 (Fla. 1985).  The McCarson Court adopted the definition of the tort set forth in § 46 of the Restatement (Second) of Torts.  Plaintiffs seeking to recover for IIED must establish the following four elements: (1) deliberate or reckless infliction of mental suffering, (2) outrageous conduct, (3) that the conduct caused the emotional distress, and (4) that the distress is severe.  See Williams v. City of Minneola, 575 So.2d 683, 691 (Fla. 5th Dist. Ct. App. 1991) (citation omitted); see also Dammarell IV, 404 F. Supp. 2d at 285. Iraq does not dispute that the allegations in the Third Amended Complaint, construed in the light most favorable to plaintiffs, suffice to establish each of these four elements.  Rather, Iraq argues that "Florida courts have consistently hued to Section 46's requirement of physical presence and held that plaintiffs who are not present during an immediate relative's mistreatment do not state a claim for IIED."  Def.'s Mem. at 16.

The Fifth District Court of Appeal's decision in Williams, however, belies that contention.

As this Court has previously explained, the Williams court held "that a plaintiff could maintain an action for IIED based on the outrageous display of pictures of the dead body of a spouse, child, sibling, or parent, regardless of whether the plaintiff witnessed the outrageous conduct." Dammarell IV, 404 F. Supp. 2d at 285.  That decision thus "tacitly acknowledged that some forms of outrageous behavior, though directed in the most immediate sense at one person, can be directed at others who are not present."  Id.; cf. Hatch v. Davis, 147 P.3d 383, 388 (Utah 2006) (reasoning that the exception to the presence requirement "reflects the law's recognition that certain conduct not committed in one's presence can nevertheless be so injurious to an individual, despite the fact that he is not present to witness it, that our societal values would be offended were we not to provide a remedy at law.").  Iraq insists that Williams, along with the decision in Armstrong v. H & C Communications, 575 So.2d 280, 282 (Fla. 5th Dist. Ct. App. 1991), should be read in the context of "the 'unique considerations' Florida law applies to cases involving dead bodies."  Def.'s Opp'n and Reply at 29 (quoting Williams, 575 So.2d at 694).  But as Iraq concedes, this Court has declined to read Williams so narrowly, concluding that the Florida Supreme Court would recognize an IIED claim by a close relative of a terrorist-bombing victim even if the relative was not present at the bombing.  See Dammarell IV, 404 F. Supp. 2d at 285; see also Salazar, 370 F. Supp. 2d at 115 n.12 (reaching the same conclusion under Illinois law and noting that "[c]ourts have uniformly held that a terrorist attack - - by its nature - - is directed not only at the victims but also at the victims' families").  Whether understood as an expansive interpretation of who the direct victims of outrageous conduct are or as a decision to dispense with the presence requirement in certain cases, Williams refutes Iraq's argument that Florida appellate courts would undoubtedly hold that "plaintiffs who are not present during an immediate

relative's mistreatment do not state a claim for IIED."  Def.'s Mem. at 16.  Hence, the bounds of the IIED tort in Florida, at least as this Court has construed the relevant state decisions, are not nearly as limited as Iraq maintains.

The question then becomes whether the Florida courts would hold that the conduct alleged here - - the hostage-taking and mistreatment of plaintiffs' fathers - - also gives rise to a claim for IIED by close relatives not present at the time of the outrageous acts.  A number of cases in this district pre-dating Ciccipio-Puleo suggest that the answer to this question is "yes."  The first of these decisions is Sutherland, 151 F. Supp. 2d at 49-50.  That case involved an American university professor who had been kidnapped and held hostage in Lebanon for over six years.  Id. at 31-37.  Sutherland sued Iran for its role in the kidnapping, and his wife and three daughters brought claims for loss of consortium, intentional infliction of emotional distress, and loss of solatium.  Id. at 45.  Operating in the pre-Ciccipio-Puleo landscape, the Sutherland court applied a form of federal common law to the plaintiffs' claims, and accordingly evaluated the IIED claims brought by Sutherland and his wife under the Restatement § 46 standards.  Id. at 47, 49.  The court had "little hesitation in finding" that Sutherland had suffered severe emotional distress, that Iran had engaged in outrageous conduct, and that such conduct had caused Sutherland's emotional distress.  Id. at 49.  Whether that same conduct gave rise to a claim for Sutherland's wife was a closer question.  Nevertheless, the court concluded that Iran had indeed caused Sutherland's wife emotional distress, either intentionally or recklessly:

> The Court finds that, when an organization takes someone hostage, it is implicitly intending to cause emotional distress among the members of that hostage's immediate family . . . .  [A]n organization taking someone hostage implicitly believes that such emotional distress is substantially certain to result.  These conclusions are based on the logical inference that a hostage without loved ones - - that is, a hostage without those who will be emotionally distressed by his absence

- - is of no value at all to a hostagetaker.  For without loved ones, there is nobody to pay for the hostage's release.  And even if the hostage's country (rather than his family) pays for his release, a hostage's loved ones play a vital role in agitating for governmental action.

Id. at 50.

Although the Sutherland court neither mentioned the presence requirement nor distinguished between claims by direct victims under § 46(1) and those by third-parties under § 46(2), the same judge confronted the presence issue in another hostage-taking case decided just a few months later.  See Jenco v. Islamic Republic of Iran, 154 F. Supp. 2d 27 (D.D.C. 2001), aff'd sub nom. Bettis v. Islamic Republic of Iran, 315 F.3d 325 (D.C. Cir. 2003).  The issue in Jenco was whether the siblings, nieces, and nephews of another former hostage could recover for the emotional distress that their relative's captivity had allegedly caused them.  See 154 F. Supp. 2d at 35.  Referencing its analysis in Sutherland, the Jenco court explained that the Restatement imposed two requirements that relatives must satisfy before recovering for intentional infliction of emotional distress: they must qualify as close relatives, and they must normally be present at the time of the defendant's outrageous conduct.  The Jenco court recognized that, in allowing Sutherland's wife to recover, it had carved out an exception to the presence requirement and thus "parted somewhat from the Restatement."  Id. at 36.  But the court had done so, it explained, "because the defendants' intent to distress her was quite implicit in the nature of the defendants' conduct."  Id.  Applying this same logic, the court determined that the Jenco plaintiffs who qualified as close relatives - - the victim's siblings - - could likewise recover even though they had not been present during their brother's detention and captivity.  Id.  That conclusion, the court reasoned, was in accord "with the analysis of the leading and most recent tort treatise," which agreed that the presence requirement should not apply where "the defendants' conduct is

sufficiently outrageous and intended to inflict severe emotional harm upon a person wh[o] is not present." Id. (quoting Dan B. Dobbs, The Law of Torts § 307, at 834 (2000)).

There is little reason to believe - - and Iraq certainly has not provided any - - that the Florida Supreme Court would reject the analysis employed in Sutherland and Jenco and would instead strictly enforce the presence requirement in a hostage-taking case such as this one. Were that court to do so, it would be rejecting an analysis and conclusion that other courts in this district have found persuasive and have followed.  See, e.g., Burnett v. Al Baraka Inv. and Dev. Corp., 274 F. Supp. 2d 86, 108 (D.D.C. 2003); Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258, 271 (D.D.C. 2003).  Furthermore, even if the Florida courts were reluctant to analyze plaintiffs' claim under § 46(2) of the Restatement, Iraq has failed to present any justification for distinguishing this case from either Dammarell IV, where this Court concluded that the Florida Supreme Court would treat the close relatives of terrorist-bombing victims as direct victims of the outrageous conduct, see 404 F. Supp. 2d at 285, or from Salazar, where this Court allowed the daughter of a terrorist-bombing victim to recover even though she was not present at the time of the attack, see 370 F. Supp. 2d at 115 & n.12.  Whether plaintiffs are viewed as direct victims of Iraq's outrageous conduct under Restatement § 46(1) or as third-party victims under Restatement § 46(2), therefore, this Court concludes that the Florida courts would hold that plaintiffs' allegations state a cognizable claim for IIED.

For all of the reasons given in Sutherland and Jenco, moreover, the emotional distress suffered by the close relatives of hostages depends even less upon those relatives' presence at the scene of the tortious conduct than in an attack on a foreign embassy.  The relatives' emotional distress rests in the fact that they cannot see or speak to the person taken hostage; that is, they

suffer because they cannot be in their loved one's "presence."  Hence, the very raison d'etre of the

presence requirement - - to draw a line limiting the cause of action to those persons who have

"genuine[ly]" been harmed, see Restatement § 46, Comment l - - evaporates when the underlying

conduct is specifically intended to harm those who are not present.  A recent state supreme court

decision recognizing exceptions to the presence requirement makes just this point.  See Hatch,

147 P.3d at 388.  The Hatch court set forth three factors that factfinders may consider in deciding

"whether conduct triggers" an exception to the presence element of an IIED claim: (1) the

relationship of the target of the conduct to the plaintiff; (2) the relationship between the person

committing the conduct and the plaintiff; and (3) the egregiousness of the conduct.  Id.  To these

three factors the court added a fourth that an absent plaintiff must show - - "that the conduct was

undertaken, in whole or in part, with the intention of inflicting injury to the absent plaintiff."  Id.

Hostage-taking is the quintessential example of conduct "undertaken . . . with the intention of

inflicting injury to" absent family members.  See id.; Sutherland, 151 F. Supp. 2d at 50.  Surely

those who engage in hostage-taking should not be shielded from liability on the basis of a

prudential limitation that was never intended to be absolute and that has been relaxed for conduct

that, while shocking, is far less egregious than the kind at issue here.  See, e.g., Cahalin v. Rebert,

10 Pa. D. & C.3d 142, 150 (Pa. Dist. Ct. 1979) (declining to enforce the presence requirement

where one parent conspired to kidnap a child and conceal the child's whereabouts from the other

parent), cited in Marlene F. v. Affiliated Psychiatric Med. Clinic, 770 P.2d 278, 285 n.4 (Cal.

1989) (Arguelles, J., concurring); see also Kajtazi v. Kajtazi, 488 F. Supp. 15, 20 (E.D.N.Y. 1978)

(allowing IIED claim by mother where father kidnapped child outside of her presence and fled the

country).  Accordingly, the Court concludes that Florida courts would recognize an exception to

the presence requirement under the circumstances of this case.

The same conclusion follows with respect to Oklahoma, which, like Florida, has adopted Restatement (Second) Torts § 46 as the controlling standard for the IIED tort.  See Breeden v. League Servs. Corp., 575 P.2d 1374, 1376-78 (Okla. 1978).  Oklahoma courts have identified the same four elements that IIED plaintiffs must establish: "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." Computer Publ'n, Inc. v. Welton, 49 P.3d 732, 735 (Okla. 2002).  Iraq again does not contest that the allegations in the Third Amended Complaint, when construed in the light most favorable to plaintiffs, could establish these four elements.  It instead hangs its hat on the Restatement's presence requirement.  As Iraq sees it, Oklahoma courts have never expressly addressed whether an absent plaintiff can state a claim for intentional infliction of emotional distress.  But given the "narrow" interpretation that Oklahoma courts have otherwise given the IIED tort, Iraq insists that those courts would decline to dispense with the presence requirement, at least under the circumstances of this case  See Def.'s Mem. at 17 (quoting Welton, 49 P.3d at 735); Def.'s Opp'n and Reply at 30.

For many of the reasons already given, the Court rejects Iraq's argument.  First, another judge in this district recently predicted that Oklahoma courts would not enforce the presence requirement in an IIED suit brought by family members of American serviceman killed in a terrorist attack abroad.  See Estate of Heiser v. Islamic Republic of Iran, 466 F. Supp. 2d 229, 354 (D.D.C. 2006).  Assuming that prediction to be correct, it follows that Oklahoma courts would act similarly with respect to IIED claims based on hostage-taking, which present an even stronger

case for either dispensing with the presence requirement or treating close relatives as direct victims. There is simply no reason to believe that an Oklahoma court adhering to § 46 of the Restatement would decline either to treat the close relatives of persons taken hostage by foreign governments or terrorist groups as direct victims of outrageous conduct, or to carve out an exception to the presence requirement for such people.

Finally, Iraq argues that the recent decision in <u>Reed v. Islamic Republic of Iran</u>, 439 F. Supp. 2d 53 (D.D.C. 2006), supports the proposition that some state courts would in fact enforce the presence requirement for IIED claims arising from the kidnapping and torture of a relative. There are critical distinctions, however, between <u>Reed</u> and the present case. For one thing, Massachusetts law provided the rule of decision in <u>Reed</u>. <u>Id.</u> at 66. Massachusetts courts, though following § 46 of the Restatement, have placed a key gloss on the presence element, requiring a victim's family member to demonstrate that he or she had "substantial, contemporaneous knowledge" of the defendant's outrageous conduct. <u>Id.</u> at 66-67 (quoting <u>Nancy P. v. D'Amato</u>, 517 N.E.2d 824, 828 (Mass. 1988)). The <u>Reed</u> court relied exclusively on this judicial gloss in rejecting the plaintiff's IIED claim. <u>Id.</u> at 67 ("The element requiring substantial, contemporaneous knowledge of the defendant's act . . . bars the plaintiff from obtaining a default judgment as to this claim."). What is more, the plaintiff there admitted that he did not learn of his father's captivity and mistreatment until after his father had been released and had returned home. "The plaintiff's distress," the <u>Reed</u> court explained, "coincided with his father's behavior after his release and upon returning to the United States, rather than from the plaintiff having contemporaneous knowledge of his father's tribulations." <u>Id.</u> Here, in contrast, neither the Florida nor the Oklahoma courts have interpreted § 46 as imposing a "substantial, contemporaneous

knowledge" requirement.  And even if they did, plaintiffs aver in their Third Amended Complaint that they "were acutely aware of the circumstances surrounding their fathers' hostage-taking and mistreatment" at all times during the mens' captivity.  Third Am. Comp. ¶ 23.  Hence, plaintiffs would likely be able to satisfy a contemporaneous-knowledge requirement even if one existed. Permitting plaintiffs to proceed with their IIED claims under Florida and Oklahoma law is therefore fully consistent with <u>Reed</u>.

## C.  Plaintiffs' Motion for Summary Judgment

The final issue is whether plaintiffs are entitled to partial summary judgment on the surviving count of their complaint.  The merits of that issue, however, are largely obscured by a procedural morass created by a representation that plaintiffs' counsel made at the motions hearing and a series of procedural challenges levied by Iraq.  Plaintiffs' written motion, though labeled as one for "summary judgment," was actually one for <u>partial</u> summary judgment on the issue of liability.  That much is clear from the opening paragraph of the motion itself ("Plaintiffs hereby move . . . for an order granting summary judgment . . . as to liability"), the first paragraph of plaintiffs' Memorandum in support of their motion ("Plaintiffs . . . are entitled to partial summary judgment of liability as to all causes of action alleged in the Third Amended Complaint"), and the proposed order that plaintiffs attached to their motion.  The proposed order specifically invoked Rule 56(c) of the Federal Rules of Civil Procedure, which permits courts to render "[a] summary judgment, interlocutory in character, . . . on the issue of liability alone although there is a genuine issue as to the amount of damages."  Fed. R. Civ. P. 56(c).  Having read these materials, the Court understood the issue to be rather straightforward: were plaintiffs entitled to partial summary judgment as to liability?  In other words, had they established that there were no genuine issues of

material fact in dispute with respect to whether Iraq (1) intentionally or recklessly (2) engaged in extreme and outrageous conduct (3) that caused them (4) severe emotional distress, such that they were entitled to judgment as a matter of law?  See Part B supra; see also Williams, 575 So.2d at 691; Welton, 49 P.3d at 735).

It is at this point that counsel's representation at the motions hearing acquires importance. Plaintiffs allege that they suffered severe emotional distress, and that this distress was "a direct result of their fathers' captivity."  See Third Am. Compl. ¶¶ 22, 23, 29-31; Pls.' Rule 56.1 Stmt. ¶ 6.  They did not, however, introduce any evidence - - via, for example, affidavits from the plaintiffs themselves - - beyond that which was presented during the earlier Daliberti litigation. And because plaintiffs were not parties in Daliberti, no evidence was introduced as to either their emotional response to their fathers' captivities or, assuming that they did suffer severe distress, whether that distress was caused by their fathers' predicament.  Hence, toward the end of the motions hearing, the Court raised with counsel the concern that plaintiffs appeared to be "relying solely on the amended complaint" to establish the final two elements of the IIED cause of action. Prelim. Tr. at 58.  The following colloquy ensued:

> MR. HALL: You're only going to the first two in the motion for summary judgment rules.
>
> THE COURT: Well, wait a minute.  That's interesting.  All four are elements of liability.  I'm not talking about damages.  All four are elements of liability.  So you're only seeking summary judgment on the first and second elements of an [IIED claim], which are the intentional or reckless nature of it and the extreme or outrageous conduct?
>
> MR. HALL: Yes, that's right.
>
> THE COURT: Okay.
>
> MR. HALL:  Because I think I'm obliged to ask for a partial summary judgment, or

> [Rule] 56(d) I think it is, you can deal with it on that level and then at some point we obviously have to offer you the evidence from the children as to the impact on them.

Id.  As this passage reveals, counsel in essence conceded that plaintiffs had not established the final two elements of their IIED claim and were not entitled to summary judgment on the issue of liability.  Counsel thus jettisoned plaintiffs' motion under Fed. R. Civ. P. 56(c) and instead asked the Court for what amounts to partial partial summary judgment, or what a leading treatise characterizes as a "partial summary adjudication." 10B C. Wright, A. Miller & M.K. Kane, Federal Practice and Procedure § 2737, at 324 (3d ed. 1998).

The substantive basis for a "partial summary adjudication" is Rule 56(d) of the Federal Rules of Civil Procedure.  This rule permits a court that "finds that summary judgment cannot be granted because there are genuine issues of material fact to be tried, . . . to issue an order that specifies the facts that appear without substantial controversy," and thus "to salvage some results from the effort involved in the denial of a motion for summary judgment."  Id. § 2737, at 311-12, 318; see also 11 James Wm. Moore et al., Moore's Federal Practice ¶ 56.40[2] (3d ed. 2003).  Although Rule 56(d) has the salutary purpose of empowering courts "to withdraw sham issues from the case and to specify those facts that really cannot be controverted," 10B Wright, Miller & Kane § 2737, at 318, there is a division of authority over whether a party can make an independent motion for relief under Rule 56(d).  Compare LaPrade v. Anderson, Civ. A. No. 97-0010, 2006 WL 3469532, at *8 (D.D.C. Nov. 29, 2006) (endorsing the view that "'[t]here is no such thing as an independent motion under Rule 56(d)'") (quoting Arado v. Gen. Fire Extinguisher Corp., 626 F. Supp. 506, 509 (N.D. Ill. 1985)), with McDonnell v. Cardiothoracic & Vascular Surgical Assoc., Inc., Civ. A. No. 03-0079, 2004 WL 1234138, at *1-*3 (S.D. Ohio May 27, 2004) (relying

on cases that endorse the opposite proposition).

There is significantly more consensus, however, regarding the power of a court that denies a motion for summary judgment under Rule 56(c) to issue an order under Rule 56(d) establishing certain facts as uncontroverted and limiting the issues to be tried.  See Singh v. George Washington Univ., 368 F. Supp. 2d 58, 68 (D.D.C. 2005) (denying the parties' summary judgment motions due to factual disputes on one element of a claim, but proceeding to evaluate the other elements because Rules 56(a) and 56(d) "contemplate a partial summary adjudication as to elements of a claim"); see also 10B Wright, Miller & Kane, Federal Practice and Procedure § 2737, at 316 (describing a Rule 56(d) order as "ancillary to a motion for summary judgment"). As mentioned above, plaintiffs' representation at the motions hearing obliges the Court to deny their motion for summary judgment under Rule 56(c), and to treat counsel's representation as an oral motion for an order under Rule 56(d).  The question then becomes whether plaintiffs, through their pleadings and the one exhibit submitted in support of their motion, have established that the facts underlying the first two elements of their IIED claim are no longer in dispute.  In answering that question and deciding whether plaintiffs are entitled to a "partial summary adjudication," the Court will employ the familiar summary-judgment standard and will enter the requested order unless Iraq can point to "a genuine issue of material fact as it relates to a particular claim or aspect of a claim."  11 Moore's Federal Practice ¶ 56.40[2].

This is where Iraq's remaining procedural challenges come into play - - "remaining" because the concession by plaintiffs' counsel effectively validates some challenges and moots others.  Those challenges boil down to the contention that plaintiffs cannot get any relief  - - whether under Rule 56(c) or Rule 56(d) - - solely on the basis of the facts alleged in their Third

Amended Complaint and their Local Rule 56.1 statement.  The facts alleged therein, Iraq points

out, are supported only with references to Judge Oberdorfer's opinion in Daliberti II.

Whether couched in the terminology of the local rules or principles of preclusion law,

however, Iraq's arguments lack merit.  For one thing, it is far from clear that plaintiffs have

actually failed to comply with the requirement in LCvR 56.1 (or the identically worded LCvR

7(h)) that all motions "for summary judgment . . . be accompanied by a statement of material facts

as to which the moving party contends there is no genuine issue, which shall include references to

the parts of the record relied on to support the statement."  The thrust of Iraq's argument is that the

facts asserted in a Rule 56.1 statement cannot be accepted as true and/or undisputed if such

assertions are supported only with reference to the complaint and a prior judicial opinion.  What

Iraq does not explain, however, is why citations to the complaint and to a another opinion from

the same court on the same underlying facts do not constitute "references to the parts of the record

relied on to support the statement."  After all, both the complaint and the Daliberti II opinion are

"parts of the record" as that record stands today.  The federal rules certainly allow plaintiffs to

seek summary judgment on the basis of these materials, see Celotex Corp. v. Catrett, 477 U.S.

317, 323 (1986) (explaining that a summary judgment "motion may, and should, be granted so

long as whatever is before the district court demonstrates that the standard for the entry of

summary judgment, as set forth in Rule 56(c), is satisfied"), and Iraq has not pointed to any

authority that would justify reading the local rule as imposing a more stringent standard.  See

Burke v. Gould, 286 F.3d 513, 519-20 (D.C. Cir. 2002) (explaining that the local rules are "to be

construed in harmony with" the Federal Rules, and that "[a]lthough Local Rule 56.1 facilitates

more precise identification of the record materials on which the parties rely, Rule 56(c) identifies

the materials the court is to consider before granting summary judgment") (quoting LCvR 1.1(a)).

Moreover, if failure strictly to comply with the local rule is reason enough to penalize the offending party, then Iraq is by far the candidate more deserving of a sanction.  Iraq's Rule 56.1 statement contains three paragraphs.  The first assails plaintiffs' Rule 56.1 statement, while the second describes the difficulties that defense counsel has faced in communicating with the new Iraqi government.  The third paragraph then concludes:

> Because of the absence of record citations by plaintiffs in their Rule 56.1 Statement, the absence of any record in this case, and the current situation in Iraq, defendant is not able to present a counterstatement as contemplated under LCvR 56.1 that addresses the facts the plaintiffs will need to establish to prove either jurisdiction or the merits of their claims, or to provide record citations relating to those facts.

Def.'s Rule 56.1 Statement ¶ 3.  By its own account, then, Iraq has failed to provide the type of statement contemplated by the local rules, which allow the Court under such circumstances to "assume the facts identified by [plaintiffs] in [their] statement of facts [as] admitted."  LCvR 56.1.  But just as the Court declines to penalize the plaintiffs for less-than-perfect compliance with the local rules, it will not sanction Iraq, whose counsel has labored under highly unusual circumstances, for failing to provide a proper Rule 56.1 Statement.

It bears emphasizing, however, that the difficulties that counsel has encountered do not excuse Iraq's failure to lodge a challenge to any of the facts alleged by plaintiffs.  For example, counsel could have brought its communication problems to the Court's attention and sought on that basis a stay of the obligation to respond to plaintiffs' motion for partial summary judgment.  See La Réunion Aérienne v. The Socialist People's Libyan Arab Jamahiriya, - - F. Supp. 2d - -, 2007 WL 706938, at *6 (D.D.C. March 9, 2007) (granting foreign sovereign's request for a stay of the plaintiff's motion for summary judgment pending resolution of a motion to dismiss).  Counsel

may also have considered filing an affidavit pursuant to Fed. R. Civ. P. 56(f) requesting additional

time for discovery.  See Pugh v. Socialist People's Libyan Arab Jamahiriya, Civ. A. No. 02-2026,

2006 WL 2384915, at *4 (D.D.C. May 11, 2006) (rejecting foreign state's procedural objections to

summary judgment motion and noting that Rule 56(f) is the way for "a non-movant who wishes to

postpone summary judgment to obtain further discovery").  But having failed to pursue these

measures or other possible avenues of relief, and having failed (by its own admission) to conduct

the necessary factual investigation, see Prelim. Tr. at 37, Iraq cannot create a factual dispute

simply by critiquing plaintiffs' reliance on the Daliberti II opinion as a shortcut for the voluminous

testimony and other evidence introduced in that default-judgment proceeding.

At bottom, the real question underlying the propriety of a Rule 56(d) order is whether the

facts as found after the four-day bench trial in Daliberti II need to be relitigated here.  In

answering that they do, Iraq maintains that plaintiffs cannot seek to establish the facts governing

this case under "the doctrine of offensive collateral estoppel."  See Def.'s Opp'n and Reply at 32.

Iraq is certainly correct that plaintiffs were not parties to the Daliberti litigation and that they

cannot use principles of issue preclusion to bar Iraq from contesting the facts as found there.  See

Arizona v. California, 530 U.S. 392, 414 (2000) (recognizing that issue preclusion does not attach

to default judgments) (citing Restatement (Second) of Judgments § 27, comment e, p. 257

(1982)).  This argument carries little weight, however, because Iraq has not sought in any of its

filings to contest the facts surrounding the kidnapping and detention of Beaty and Barloon.  Nor

does counsel's generic contention at the motions hearing that Iraq does not concede the facts

suffice to create a factual dispute.  Prelim. Tr. at 35.  In short, plaintiffs' reliance on the Daliberti II

opinion as a shortcut for reproducing the evidentiary record from that case has not precluded Iraq

from disputing any of the facts material to plaintiffs' surviving claim. Iraq has simply chosen not to do so.

For similar reasons, the decision in <u>Weinstein v. Islamic Republic of Iran</u>, 175 F. Supp. 2d 13 (D.D.C. 2001), is of little help to Iraq. In that default-judgment proceeding, Judge Lamberth (1) declined to take judicial notice of the findings of fact and conclusions of law previously issued in another default-judgment proceeding involving the same defendants and the same underlying facts, and (2) refused to hold that the defendants were "collaterally estopped from relitigating" the findings and conclusions from the earlier case. <u>Id.</u> at 16-17. Again, however, plaintiffs have not attempted to prevent Iraq from challenging the factual basis for their claims; Iraq has simply decided not to, or been unable to do so. And while there is some room for debate as to the power of courts to assume the truth of court proceedings that have been judicially noticed, <u>compare</u> <u>Estate of Heiser</u>, 466 F. Supp. 2d at 263, <u>and</u> <u>Salazar</u>, 370 F. Supp. 2d at 109 n.6, <u>with</u> <u>Howard v.</u> <u>Gutierrez</u>, - - F. Supp. 2d - - , 2007 WL 404352, at *9 n.5 (D.D.C. Feb. 6, 2007), <u>Weinstein</u> is also easily distinguishable in this regard. In declining to take judicial notice in that case, Judge Lamberth emphasized that, had the defendants entered an appearance either in the current or the previous case, "they almost certainly would dispute the accuracy of th[e] particular facts" found. 175 F. Supp. 2d at 17. Iraq, in sharp contrast, has entered an appearance here and, despite the opportunity to do so, has not "dispute[d] the accuracy of th[e] particular facts" found in <u>Daliberti II</u>. Accordingly, Iraq's reliance on principles of issue preclusion generally, and on <u>Weinstein</u> specifically, is misplaced.

Finally, Iraq argues that the FSIA itself bars the Court from entering summary judgment in plaintiffs' favor. The statute prohibits district courts from entering a <u>default judgment</u> against a

foreign state "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). "Obviously," Iraq insists, "no less is required when a plaintiff seeks summary judgment against a foreign state that has entered an appearance." Def.'s Opp'n and Reply at 32. Although there is a strong argument that the statutory standard for entering a default judgment against an absent foreign sovereign does <u>not</u> apply to a motion for summary judgment actively opposed by a foreign state that has entered an appearance through counsel, the Court need not resolve this question because an order under Fed. R. Civ. P. 56(d) does not qualify as an entry of judgment. <u>See</u> 10B Wright, Miller & Kane, Federal Practice and Procedure § 2737, at 323 (citing 1948 Advisory Committee Notes to Rule 56).

Because the material facts underlying two elements of plaintiffs' IIED claim "exist without substantial controversy," and because plaintiffs have conceded that they are not yet entitled to judgment on the question of liability, the Court will deny their motion for partial summary judgment under Rule 56(c) but grant their oral motion for partial summary adjudication under Rule 56(d). The facts underlying the detention, imprisonment, and release of Kevin Beaty and William Barloon, as described in <u>Daliberti v. Republic of Iraq</u>, 146 F. Supp. 2d 19 (D.D.C. 2001) ("<u>Daliberti II</u>"), "shall be deemed established" for the purposes of all further proceedings in this case. <u>See</u> Fed. R. Civ. P. 56(d); 10B Wright, Miller & Kane, Federal Practice and Procedure, § 2737, at 323. These facts equate to those set forth in paragraphs 7-20 of the Third Amended Complaint, and paragraphs 1-3, 7-8, and 14-17 of plaintiffs' Rule 56.1 statement.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court grants in part and denies in part defendant's motion to

dismiss, and grants in part and denies in part plaintiffs' motion for partial summary judgment.  A

separate order has been posted on this date.


/s/
_____
JOHN D. BATES
United States District Judge

Dated:   March 20, 2007